Filed 6/15/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| CALIFORNIA BUILDING INDUSTRY ASSOCIATION, | ) ) ) | |
| Plaintiff and Respondent, | ) ) ) | S212072 |
| v. | ) ) | Ct.App. 6 H038563 |
| CITY OF SAN JOSE, | ) ) | Santa Clara County |
| Defendant and Appellant; | ) ) | Super. Ct. No. CV167289 |
| AFFORDABLE HOUSING NETWORK OF SANTA CLARA COUNTY et al., | ) ) ) | |
| Interveners and Appellants. | ) ) | |

Health and Safety Code section 50003, subdivision (a), currently provides: "The Legislature finds and declares that . . . there exists within the urban and rural areas of the state a serious shortage of decent, safe, and sanitary housing which persons and families of low or moderate income . . . can afford.  This situation creates an absolute present and future shortage of supply in relation to demand . . . and also creates inflation in the cost of housing, by reason of its scarcity, which tends to decrease the relative affordability of the state's housing supply for all its residents."

This statutory language was first enacted by the Legislature *over 35 years ago*, in the late 1970s.  (Stats. 1975, 1st Ex. Sess., ch. 1, § 7, pp. 3859-3861, adding Health & Saf. Code, former § 41003; Stats. 1979, ch. 97, § 2, p. 225,

amending Health & Saf. Code, § 50003.)  It will come as no surprise to anyone familiar with California's current housing market that the significant problems arising from a scarcity of affordable housing have not been solved over the past three decades.  Rather, these problems have become more severe and have reached what might be described as epic proportions in many of the state's localities.  All parties in this proceeding agree that the lack of affordable housing is a very significant problem in this state.

As one means of addressing the lack of a sufficient number of housing units that are affordable to low and moderate income households, more than 170 California municipalities have adopted what are commonly referred to as "inclusionary zoning" or "inclusionary housing" programs.  (Non-Profit Housing Association of Northern California, Affordable by Choice:  Trends in California Inclusionary Housing Programs (2007) p. 3 (hereafter NPH Affordable by Choice).)  As a 2013 publication of the United States Department of Housing and Urban Development (HUD) explains, inclusionary zoning or housing programs "require or encourage developers to set aside a certain percentage of housing units in new or rehabilitated projects for low- and moderate-income residents.  This integration of affordable units into market-rate projects creates opportunities for households with diverse socioeconomic backgrounds to live in the same developments and have access to [the] same types of community services and amenities . . . ."  (U.S. Dept. of Housing and Urban Development, *Inclusionary Zoning and Mixed-Income Communities* (Spring 2013) Evidence Matters, p. 1, fn. omitted (hereafter *2013 HUD Inclusionary Zoning*)

<http://www.huduser.org/portal/periodicals/em/spring13/highlight3.html> [as of June 15, 2015].)[1]

In 2010, after considerable study and outreach to all segments of the community, the City of San Jose (hereafter sometimes referred to as the city or San Jose) enacted an inclusionary housing ordinance that, among other features, requires all new residential development projects of 20 or more units to sell at least 15 percent of the for-sale units at a price that is affordable to low or moderate income households. (The ordinance is described in greater detail in pt. II., *post*.)

Very shortly after the ordinance was enacted and before it took effect, plaintiff California Building Industry Association (CBIA) filed this lawsuit in superior court, maintaining that the ordinance was invalid on its face on the ground that the city, in enacting the ordinance, failed to provide a sufficient evidentiary basis "to demonstrate a reasonable relationship between any adverse public impacts or needs for additional subsidized housing units in the City ostensibly caused by or reasonably attributed to the development of new

---

[1] The 2013 HUD article further explains that inclusionary zoning or housing programs "vary in their structure; they can be mandatory or voluntary and have different set-aside requirements, affordability levels, and control periods. Most [inclusionary zoning] programs offer developers incentives such as density bonuses, expedited approval, and fee waivers to offset some of the costs associated with providing the affordable units. Many programs also include developer opt-outs or alternatives, such as requiring developers to pay fees or donate land in lieu of building affordable units or providing the units offsite. Studies show that mandatory programs produce more affordable housing than voluntary programs, and developer opt-outs can reduce opportunities for creating mixed-income housing. At the same time, [inclusionary zoning's] reliance on the private sector means that its effectiveness also depends on the strength of a locality's housing market, and researchers acknowledge that a certain degree of flexibility is essential to ensuring the success of [inclusionary zoning] programs." (*2013 HUD Inclusionary Zoning*, *supra*, at p. 1, fns. omitted.)

3

residential developments of 20 units or more and the new affordable housing exactions and conditions imposed on residential development by the Ordinance." The complaint maintained that under the "controlling state and federal constitutional standards governing such exactions and conditions of development approval, and the requirements applicable to such housing exactions as set forth in *San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, and *Building Industry Assn. of Central California v. City of Patterson* (2009) 171 Cal.App.4th 886" the conditions imposed by the city's inclusionary housing ordinance would be valid only if the city produced evidence demonstrating that the requirements were reasonably related to the adverse impact on the city's affordable housing problem *that was caused by or attributable to the proposed new developments that are subject to the ordinance's requirements*, and that the materials relied on by the city in enacting the ordinance did not demonstrate such a relationship. Although the complaint did not explicitly spell out the specific nature of its constitutional claim, CBIA has subsequently clarified that its challenge rests on "the unconstitutional conditions doctrine, as applied to development exactions" under the takings clauses (or, as they are sometimes denominated, the just compensation clauses) of the United States and California Constitutions. CBIA's challenge is based on the premise that the conditions imposed by the San Jose ordinance constitute "exactions" for purposes of that doctrine. The superior court agreed with CBIA's contention and issued a judgment enjoining the city from enforcing the challenged ordinance.

The Court of Appeal reversed the superior court judgment, concluding that the superior court had erred (1) in finding that the San Jose ordinance requires a developer to dedicate property to the public within the meaning of the takings clause, and (2) in interpreting the controlling constitutional principles and the decision in *San Remo Hotel v. City and County of San Francisco, supra,* 27

4

Cal.4th 643 (*San Remo Hotel*), as limiting the conditions that may be imposed by such an ordinance to only those conditions that are reasonably related to the adverse impact the development projects that are subject to the ordinance themselves impose on the city's affordable housing problem. Distinguishing the prior appellate court decision in *Building Industry Assn. of Central California v. City of Patterson*, *supra*, 171 Cal.App.4th 886 (*City of Patterson*), the Court of Appeal held that the appropriate legal standard by which the validity of the ordinance is to be judged is the ordinary standard that past California decisions have uniformly applied in evaluating claims that an ordinance regulating the use of land exceeds a municipality's police power authority, namely, whether the ordinance bears a real and substantial relationship to a legitimate public interest. The Court of Appeal concluded that the matter should be remanded to the trial court for application of this traditional standard.

CBIA sought review of the Court of Appeal decision in this court, maintaining that the appellate court's decision conflicts with the prior Court of Appeal decision in *City of Patterson*, *supra*, 171 Cal.App.4th 886, and that *City of Patterson* was correctly decided and should control here. We granted review to determine the soundness of the Court of Appeal's ruling in this case.

For the reasons discussed below, we conclude that the Court of Appeal decision in the present case should be upheld. As explained hereafter, contrary to CBIA's contention, the conditions that the San Jose ordinance imposes upon future developments do not impose "exactions" upon the developers' property so as to bring into play the unconstitutional conditions doctrine under the takings clause of the federal or state Constitution. Furthermore, unlike the condition that was at issue in *San Remo Hotel*, *supra*, 27 Cal.4th 643, and to which the passage in that opinion upon which CBIA relies was addressed — namely, an in lieu monetary fee that is imposed to mitigate a particular adverse effect of the

5

development proposal under consideration — the conditions imposed by the San Jose ordinance at issue here do not require a developer to pay a monetary fee but rather place a limit on the way a developer may use its property. In addition, the conditions are intended not only to mitigate the effect that the covered development projects will have on the city's affordable housing problem but also to serve the distinct, but nonetheless constitutionally legitimate, purposes of (1) *increasing the number of affordable housing units in the city* in recognition of the insufficient number of existing affordable housing units in relation to the city's current and future needs, and (2) assuring that new affordable housing units that are constructed *are distributed throughout the city as part of mixed-income developments* in order to obtain the benefits that flow from economically diverse communities and avoid the problems that have historically been associated with isolated low income housing. Properly understood, the passage in *San Remo Hotel* upon which CBIA relies does not apply to the conditions imposed by San Jose's inclusionary housing ordinance.

Accordingly, we conclude that the judgment of the Court of Appeal in this case should be affirmed.

## I. Statutory background

We begin with a brief summary of the California statutes that form the background to the San Jose ordinance challenged in this case.

Nearly 50 years ago, the California Legislature enacted a broad measure requiring all counties and cities in California to "adopt a comprehensive, long-term general plan for the physical development of the county or city." (Gov. Code, § 65300 et seq., enacted by Stats. 1965, ch. 1880, § 5, pp. 4334, 4336, operative Jan. 1, 1967.) Each municipality's general plan is to contain a variety of mandatory and optional elements, including a mandatory housing element consisting of standards and plans for housing sites in the municipality that "shall

6

endeavor to make adequate provision for the housing needs of all economic segments of the community." (Gov. Code, former § 65302, subd. (c), as amended by Stats. 1967, ch. 1658, § 1, p. 4033; see now Gov. Code, § 65580.)

A little more than a decade later, in 1980, declaring (1) that "[t]he availability of housing is of vital statewide importance," (2) that "the early attainment of decent housing and a suitable living environment for every Californian . . . is a priority of the highest order," (3) that "[t]he early attainment of this goal requires the cooperative participation of government and the private sector in an effort to expand housing opportunities and accommodate the housing needs of Californians of all economic levels," and (4) that "*[l]ocal and state governments have a responsibility to use the powers vested in them to facilitate the improvement and development of housing to make adequate provision for the housing needs of all economic segments of the community*" (Gov. Code, § 65580, subds. (a), (b), (d), italics added), the Legislature enacted a separate, comprehensive statutory scheme that substantially strengthened the requirements of the housing element component of local general plans. (Gov. Code, §§ 65580-65589, enacted by Stats. 1980, ch. 1143, § 3, pp. 3697-3703.) The 1980 legislation — commonly referred to as the "Housing Element Law" (see, e.g., *Fonseca v. City of Gilroy* (2007) 148 Cal.App.4th 1174, 1179) — sets forth in considerable detail a municipality's obligations to analyze and quantify the locality's existing and projected housing needs for all income levels, including the locality's share of the regional housing need as determined by the applicable regional " '[c]ouncil of governments' " (Gov. Code, § 65582, subd. (b)), and to adopt and to submit to the California Department of Housing and Community Development a multiyear schedule of actions the local government is undertaking to meet these needs. (Id., §§ 65583-65588.) In particular, the legislation requires a municipality, "[i]n order to make adequate provision for the housing needs of all

7

economic segments of the community, . . . [to] [¶] [i]dentify actions that will be taken to make sites available during the planning period . . . with appropriate zoning and development standards and with services and facilities to accommodate that portion of the city's or county's share of the regional housing need for each income level" (Gov. Code, § 65583, subd. (c)(1)) and to "[a]ssist in the development of adequate housing to meet the needs of extremely low, very low, low-, and moderate-income households." (*Id*., subd. (c)(2).)

In addition to adopting the Housing Element Law, the Legislature has enacted a variety of other statutes to facilitate and encourage the provision of affordable housing, for example, prohibiting local zoning and other restrictions that preclude the construction of affordable housing units (see, e.g., Gov. Code, §§ 65913.1 [least cost zoning law], 65589.5 [Housing Accountability Act]), and requiring local governments to provide incentives, such as density bonuses, to developers who voluntarily include affordable housing in their proposed development projects. (Gov. Code, § 65915.) Furthermore, with respect to two geographic categories — redevelopment areas and the coastal zone — the Legislature has enacted statutes explicitly directing that new residential development within such areas include affordable housing units. (See Health & Saf. Code, § 33413, subd. (b)(1), (2)(A)(i) [redevelopment areas]; Gov. Code, § 65590, subd. (d) [coastal zone].)

Although to date the California Legislature has not adopted a statewide statute that requires every municipality to adopt a mandatory inclusionary housing ordinance if needed to meet the municipality's obligations under the Housing Element Law, in recent decades more than 170 California cities and counties have adopted such inclusionary housing ordinances in an effort to meet such obligations. (See generally NPH Affordable by Choice, *supra*, pp. 3, 40 [listing cities and counties with inclusionary policies as of 2006]; Nat. Housing

8

Conference*, Inclusionary Zoning: The California Experience* (Feb. 2004) NHC Affordable Housing Policy Review, vol. 3, issue 1; Calavita et al., *Inclusionary Housing in California: The Experience of Two Decades* (1998) 64 J. Amer. Planning Assn. 150, 158-164.)  The provisions and legislative history of the affordable housing statutes make it clear that the California Legislature is unquestionably aware of these numerous local mandatory inclusionary housing ordinances and that the existing state legislation is neither inconsistent with nor intended to preempt these local measures.[2]

**II.  Background and description of challenged San Jose inclusionary housing ordinance**

It is within the context of the foregoing statutory framework that San Jose began considering the need and desirability of adopting an inclusionary housing

---

[2]     For example, Government Code section 65589.5, subdivision (f)(1), a provision of the Housing Accountability Act, provides in this regard, in part: "Nothing in this section shall be construed to prohibit a local agency from requiring the development project to comply with objective, quantifiable, written development standards, conditions, and policies appropriate to, and consistent with, meeting the jurisdiction's share of the regional housing need pursuant to Section 65584."  Similarly, although the legislative history of the density bonus law, Government Code section 65915, discloses a disagreement among supporters of the law with regard to how that statute would apply to developers subject to a local mandatory inclusionary housing ordinance, that history makes clear that there was agreement that the density bonus law "does not preempt the ability [of] local ordinances to require the inclusion of affordable (low, very low, or moderate-income) units within a housing development."  (Sen. Hollingsworth, letter to Sen. Pereira (Aug. 25, 2005) ___ Sen. J. (2005-2006 Reg. Sess.) pp. 2293-2294 [legislative intent of Sen. Bill No. 435 (2005-2006 Reg. Sess.) and Sen. Bill No. 1818 (2003-2004 Reg. Sess.)], reprinted at Historical and Statutory Notes, 36D West's Ann. Gov. Code (2009 ed.) foll. § 65915, pp. 233-234; see Assemblymember Mullin, letter (Sept. 8, 2005) 3 Assem. J. (2005-2006 Reg. Sess.) pp. 3670-3671 [same], reprinted at Historical and Statutory Notes, 36D West's Ann. Gov. Code, *supra*, at p. 234.)

ordinance.  As noted, the statewide Housing Element Law places responsibility upon a city to use its powers to facilitate the development of housing that makes adequate provision for all economic segments of the community, in particular extremely low, very low, lower and moderate income households, including the city's allocation of the regional housing need as determined by the applicable regional council of governments.  (Gov. Code, §§ 65580, subd. (d), 65583, 65584.)[3]

In December 2008, the Association of Bay Area Governments (ABAG), the regional council of governments within whose jurisdiction the City of San Jose falls (see Gov. Code, § 65588, subd. (e)(1)(B)), calculated San Jose's share of the regional need for new housing over the 2007-2014 planning period as approximately 34,700 units, of which approximately 19,300 units — *or about 60 percent of the new housing unit*s *in San Jose* — would be needed to house moderate, low, very low, and extremely low income households.  As of February 2009, however, San Jose had met only a small percentage of its regional need allocation for moderate or lower income households (6 percent of the need for moderate income households, 2 percent for lower income households, 16 percent for very low income households, and 13 percent for extremely low income households, respectively).

---

[3] California statutes generally define the various low and moderate income levels by reference to the levels set by federal law, but in the absence of applicable federal standards, extremely low income households are defined as those earning no more than 30 percent of the area median income (adjusted for family size) (Health & Saf. Code, § 50106); very low income households are defined as those earning no more than 50 percent of the area median income (*id.*, § 50105); lower income households are defined as those earning no more than 80 percent of the area median income (*id.*, § 50079.5); and moderate income households are defined as those earning less than 120 percent of area median income.  (*Id.*, § 50093.)

10

Prior to the adoption of the challenged citywide ordinance in 2010, San Jose's experience with a mandatory inclusionary housing policy was limited to residential development projects that were undertaken within the redevelopment areas of the city. (At that time, redevelopment areas comprised almost 20 percent of the city's territory and included one-third of the city's population.) As noted, redevelopment areas were one of the two types of locations within which the Legislature had directed that any new residential development must include some affordable housing units. Under the applicable statute, at least 15 percent of all new or substantially rehabilitated dwelling units in a redevelopment project undertaken by a public or private entity other than the redevelopment agency were required to be made available at an affordable housing cost and to be occupied by persons and families of low or moderate income. (Health & Saf. Code, § 33413, subd. (b)(2)(A)(i).)[4] Between 1999 and 2009, more than 10,000 affordable housing units had been built in the redevelopment areas of San Jose under the city's redevelopment inclusionary housing policy.

In part as a result of this experience with a mandatory inclusionary housing requirement in its redevelopment areas, the city began considering the feasibility of adopting a *citywide* inclusionary housing policy. Out of concern for the potential economic impact of such a citywide requirement on developers, however, the city retained a private consulting firm to conduct an economic feasibility study of a citywide inclusionary housing policy. The very extensive 300-page study, prepared by the consulting firm with input from developers,

---

[4]     The statute also requires that when new (or substantially rehabilitated) dwelling units are developed in a redevelopment project by the redevelopment agency itself, at least 30 percent of the units must be affordable to low or moderate income families. (Health & Saf. Code, § 33413, subd. (b)(1).)

11

affordable housing advocates, community organizations and others, concluded that inclusionary housing could be economically feasible with certain developer incentives and under improved economic conditions.

After reviewing the study, the city council directed city staff to obtain further input from affected stakeholders and the community generally and then to bring a draft policy to the council for its consideration. Between June and December 2008, officials at the city housing department held more than 50 meetings with community members, developer and labor associations, affordable housing advocates and community organizations, and presented a draft policy to the council. In December 2008, after discussion, the city council directed staff to draft an inclusionary housing ordinance that would meet specified requirements agreed upon by the council. A draft ordinance was written and released for public review in July 2009, and between July and October 2009 nine public meetings were held throughout the city to discuss the draft ordinance. On January 26, 2010, the city council adopted the citywide inclusionary housing ordinance at issue in this case. (San Jose Ordinance No. 28689, amending San Jose Mun. Code, tit. 5 to add new ch. 5.08 adopting a "citywide inclusionary housing program"; San Jose Mun. Code, §§ 5.08.010-5.08.730.)[5]

We summarize the principal provisions of the lengthy ordinance, which runs 57 pages.

The ordinance begins with a list of findings and declarations, detailing the steady increase in the cost of housing in San Jose generally and the substantial

_____

[5]     Hereafter, we shall cite sections of the ordinance using the following format, e.g., S.J.M.C. § 5.08.010. The ordinance is available online at <https://www.municode.com/library/ca/san_jose/codes/code_of_ordinances> [as of June 15, 2015.

12

need for affordable housing for extremely low, very low, lower, and moderate income households to meet the city's regional housing needs allocation as determined by ABAG. The findings note that "[r]equiring affordable units within each development is consistent with the community's housing element goals of protecting the public welfare by fostering an adequate supply of housing for persons at all economic levels and maintaining both economic diversity and geographically dispersed affordable housing." (S.J.M.C. § 5.08.010 F.) The findings further observe that requiring builders of new market rate housing to provide some housing affordable to low and moderate income families "is also reasonably related to the impacts of their projects, because: [¶] 1. Rising land prices have been a key factor in preventing development of new affordable housing. New market-rate housing uses available land and drives up the price of remaining land. New development without affordable units reduces the amount of land development opportunities available for the construction of affordable housing. [¶] 2. New residents of market-rate housing place demands on services provided by both public and private sectors, creating a demand for new employees. Some of these public and private sector employees needed to meet the needs of the new residents earn incomes only adequate to pay for affordable housing. Because affordable housing is in short supply in the city, such employees may be forced to live in less than adequate housing within the city, pay a disproportionate share of their incomes to live in adequate housing in the city, or commute ever increasing distances to their jobs from housing located outside the city. These circumstances harm the city's ability to attain employment and housing goals articulated in the city's general plan and place strains on the city's ability to accept and service new market-rate housing development." (*Ibid.*)

The next section, setting forth the purposes of the ordinance, explains that a principal purpose is to enhance the public welfare by establishing policies

13

requiring the development of housing affordable to low and moderate income households in order to meet the city's regional share of housing needs and implement the goals and objectives of the city's general plan and housing element. A further purpose is to provide for the residential integration of low and moderate income households with households of market rate neighborhoods and to disperse inclusionary units throughout the city where new residential development occurs. In addition, the ordinance is intended to alleviate the impacts that would result from the use of available residential land solely for the benefit of households that are able to afford market rate housing and to mitigate the service burden imposed by households in new market rate residential developments by making additional affordable housing available for service employees. Finally, the ordinance provides residential developers with a menu of options from which to select alternatives to the construction of inclusionary units on the same site as market rate residential developments. (S.J.M.C. § 5.08.020.)

The substantive provisions of the ordinance follow. The requirements contained in the ordinance apply to all residential developments within the city that create 20 or more new, additional, or modified dwelling units. (S.J.M.C. § 5.08.250 A.) With regard to such developments, the ordinance's basic inclusionary housing requirement specifies that 15 percent of the proposed on-site for-sale units in the development shall be made available at an "affordable housing cost" to households earning no more than 120 percent of the area median income for Santa Clara County adjusted for household size. (S.J.M.C. §§ 5.08.400 A.1., 5.08.130.) The ordinance generally defines affordable housing cost by reference to the definition set forth in Health and Safety Code section 50052.5 (S.J.M.C. § 5.08.105), which in turn defines affordable housing cost as 30 percent of the area median income of the relevant income group (i.e. extremely low, very low, lower

14

and moderate income). (Health & Saf. Code, § 50052.5, subd. (b)(1), (2), (3), (4).)[6]

As an alternative to providing the required number of for-sale inclusionary units on the same site as the market rate units, the ordinance affords a developer a number of compliance options. At the same time, as an apparent incentive to encourage developers to choose to provide on-site inclusionary units, the

_____

[6] In addition to requiring 15 percent of *for-sale* units to be made available at an affordable housing cost, with respect to *rental* residential development the ordinance requires 9 percent of the units to be made available for rent at an affordable housing cost to moderate income households, and 6 percent of the units to be made available at an affordable housing cost to very low income households. (S.J.M.C. § 5.08.400 A.2..) The provision relating to rental units, however, explicitly provides that it "shall be operative [only] at such time as current appellate case law in Palmer/Sixth Street Properties, L.P. v. City of Los Angeles, 175 Cal.App.4th 1396 (2d Dist. 2009) is overturned, disapproved, or depublished by a court of competent jurisdiction or modified by the state legislature to authorize control of rents of inclusionary units." (*Ibid.*)

In the 2009 decision in *Palmer/Sixth Street Properties*, *L.P. v. City of Los Angeles*, *supra*, 175 Cal.App.4th 1396 1410-1411 (*Palmer/Sixth Street Properties*), the Court of Appeal held that the vacancy decontrol provisions of the Costa-Hawkins Rental Housing Act (Civ. Code, § 1954.53, subd. (a)) — that permit residential landlords, except in specified circumstances, to establish the initial rental rate for a dwelling or unit — precluded the City of Los Angeles from enforcing a provision of its mandatory inclusionary housing ordinance that required the developer of a residential rental development to rent some of the rental units at a specified below market, affordable rental rate. The provision of the San Jose ordinance in question recognizes that unless *Palmer/Sixth Street Properties* is judicially overturned or legislatively modified, the provisions of the San Jose ordinance applicable to rental units, limiting the initial rent that a developer can charge for a newly constructed residential rental unit, cannot be enforced.

Although, in light of *Palmer/Sixth Street Properties*, the provisions of the ordinance are not operative as to new rental units, when a residential development includes both for-sale and rental units, the ordinance provides that its provisions applicable to for-sale units shall apply to the portion of the development that consists of for-sale units. (S.J.M.C. § 5.08.440.)

15

ordinance provides that when a developer chooses one of the alternative compliance options, the inclusionary housing requirement increases to no less than 20 percent of the total units in the residential development, as contrasted with the no less than 15 percent requirement that applies to on-site inclusionary units. (S.J.M.C. § 5.08.500 B.) The alternative compliance options include: (1) constructing off-site affordable for-sale units (S.J.M.C. § 5.08.510 A.), (2) paying an in lieu fee based on the median sales price of a housing unit affordable to a moderate income family (S.J.M.C. § 5.08.520), (3) dedicating land equal in value to the applicable in lieu fee (S.J.M.C. § 5.08.530), or (4) acquiring and rehabilitating a comparable number of inclusionary units that are affordable to low or very low income households. (S.J.M.C. § 5.08.550.)

As additional incentives to encourage developers to comply with the ordinance by providing affordable units on site, the ordinance permits a developer who provides all of the required affordable units on the same site as the market rate units to apply for and obtain a variety of economically beneficial incentives, including (1) a density bonus that meets the requirements of Government Code section 65915 et seq.,[7] (2) a reduction in the number of parking spaces otherwise required by the San Jose Municipal Code, (3) a reduction in minimum set-back requirements, and (4) financial subsidies and assistance from the city in the sale of the affordable units. (S.J.M.C. § 5.08.450.)

---

[7] The density bonus provisions of Government Code section 65915 are very detailed, specifying a variable bonus depending upon the household income category to be served (very low income, low income, moderate income) and the percentage of units the developer agrees to include in its proposed project. (Gov. Code, § 65915, subd. (f).)

16

The ordinance also addresses the characteristics of the affordable units to be constructed on site. The ordinance requires that such units have the same quality of exterior design and comparable square footage and bedroom count as market rate units (S.J.M.C. § 5.08.470 B., F.), but permits some different "unit types" of affordable units (for example, in developments with detached single-family market rate units, the affordable units may be attached single-family units or may be placed on smaller lots than the market rate units) (S.J.M.C. § 5.08.470 E.), and also allows the affordable units to have different, but functionally equivalent, interior finishes, features, and amenities, compared with the market rate units. (S.J.M.C. § 5.08.470 C.)

The ordinance additionally contains a number of provisions intended to ensure that the number of affordable housing units required by the ordinance is not lost upon resale of an affordable unit. To this end, the ordinance requires that the guidelines to be adopted by city officials to implement the ordinance "shall include standard documents . . . to ensure the continued affordability of the inclusionary units approved for each residential development." (S.J.M.C. § 5.08.600 A.) Such documents may include, but are not limited to, "inclusionary housing agreements, regulatory agreements, promissory notes, deeds of trust, resale restrictions, rights of first refusal, options to purchase, and/or other documents," and shall be recorded against the residential development, all inclusionary units, and any site subject to the provisions of the ordinance. (*Ibid.*) The ordinance further provides that such documents shall include "subordinate shared appreciation documents permitting the city to recapture at resale the difference between the market rate value of the inclusionary unit and the affordable housing cost, plus a share of appreciation realized from an unrestricted sale in such amounts as deemed necessary by the city to replace the inclusionary unit." (*Ibid.*) The ordinance specifies that all inclusionary units "shall remain

17

affordable to the targeted income group for no less than the time periods set forth in California Health and Safety Code Sections 33413(c)(1) and (2)" (S.J.M.C. § 5.08.600 B.),[8] and that "all promissory note repayments, shared appreciation payments, or other payments collected under this section" shall be deposited in the City of San Jose affordable housing fee fund (S.J.M.C. § 5.08.600 C.), from which funds may be expended exclusively to provide housing affordable to extremely low, very low, lower and moderate income households.  (S.J.M.C. § 5.08.700 B.)

The ordinance further contains a waiver provision, declaring that the ordinance's requirements may be "waived, adjusted, or reduced" by the city "if an applicant shows, based on substantial evidence, that there is no reasonable relationship between the impact of a proposed residential development and the requirements of this chapter, or that applying the requirements of this chapter would take property in violation of the United States or California Constitutions." (S.J.M.C. § 5.08.720 A.)  This section goes on to provide that "[t]he waiver, adjustment or reduction may be approved only to the extent necessary to avoid an unconstitutional result, after adoption of written findings, based on substantial evidence, supporting the determinations required by this section."  (S.J.M.C. § 5.08.720 E.)

---

**8**     Health and Safety Code section 33413, subdivision (c)(1) provides that affordable units shall remain available at affordable cost for not less than 45 years for home ownership units.  Health and Safety Code section 33413, subdivision (c)(2) allows the sale of such units prior to the expiration of 45 years for a higher than affordable cost but only under a program that protects the public entity's affordable housing interest by providing for the deposit of an appropriate amount of the proceeds of the sale into the entity's low and moderate income housing fund.

Finally, although the ordinance was adopted in January 2010, the city council, in recognition of the significant disruption in the local housing market that had accompanied the nationwide recession, provided that the ordinance would not become operative until the earlier of (1) six months following the first 12-month consecutive period in which 2,500 residential building permits had been issued by the city, with a minimum of 1,250 permits issued for dwelling units outside the San Jose redevelopment area, or (2) January 1, 2013. (S.J.M.C. § 5.08.300.)

### III. Lower court proceedings

On March 24, 2010, just two months after the ordinance was enacted, CBIA filed the underlying lawsuit in this proceeding in superior court, seeking invalidation of the ordinance. The complaint alleged that the ordinance was invalid on its face because at no time prior to the adoption of the ordinance had the city provided substantial evidence "to demonstrate a reasonable relationship between any adverse public impacts or needs for additional subsidized housing units in the City ostensibly caused by or reasonably attributed to the development of new residential developments of 20 units or more and the new affordable housing exactions and conditions imposed on residential development by the Ordinance." The complaint maintained that the city's actions in enacting the ordinance were "unlawful, unconstitutional, and in violation of controlling state and federal constitutional standards governing such exactions and conditions of development approval, and the requirements applicable to such housing exactions as set forth in *San Remo Hotel L.P. v. City & County of San Francisco* (2002) 27 Cal.4th 643, and *Building Industry Association of Central California v. City of Patterson* (5th Dist. 2009) 171 Cal.App.4th 886." The complaint sought a judicial declaration that the ordinance is invalid, and injunctive relief prohibiting the city from enforcing the ordinance.

19

Six nonprofit affordable housing organizations and a low-income resident of San Jose sought leave to intervene in support of the challenged ordinance.**9** Although CBIA opposed the motion, the trial court granted the motion and permitted intervention.

In their pretrial briefs, both the city and interveners took issue with CBIA's contention that a passage in this court's opinion in *San Remo Hotel*, *supra*, 27 Cal.4th 643, should properly be interpreted to apply to the San Jose affordable housing ordinance at issue. Contrary to CBIA's claim that under *San Remo Hotel* such an ordinance is valid only if the requirements that the ordinance imposes are reasonably related to the adverse effects or impacts that are caused by or attributable to the developments upon which the requirements are imposed, the city and interveners maintained that the ordinance's validity is properly evaluated under the ordinary standard of review applicable to legislative land use regulations, namely, simply that the regulation's requirements must be reasonably related to the municipality's interest in promoting the health, safety, and welfare of the community. The city and interveners argued that under this ordinarily applicable standard the challenged affordable housing ordinance was unquestionably valid.

After extensive briefing, the superior court agreed with CBIA's legal contentions, concluding that the ordinance was constitutionally invalid and enjoining its enforcement. In its order, the court rejected the city's position that

---

**9** The following nonprofit organizations sought intervention: Affordable Housing Network of Santa Clara County, California Coalition for Rural Housing, Housing California, Non-Profit Housing Association of Northern California, San Diego Housing Federation, and the Southern California Association of NonProfit Housing.

20

the inclusionary ordinance did not require a developer to dedicate or convey property, and struck down the ordinance. The court determined that the city had failed to show that there was evidence in the record "demonstrating the constitutionally required reasonable relationships between the deleterious impacts of new residential developments and the new requirements to build and to dedicate the affordable housing or pay the fees in lieu of such property conveyances."

The Court of Appeal reversed the superior court judgment. Initially, the appellate court rejected CBIA's contention that the ordinance requires a developer seeking a permit to " 'dedicate or convey property (new homes) for public purposes,' or alternatively, pay a fee in lieu of 'such compelled transfers of property,' " concluding that the ordinance "does not prescribe a dedication." The appellate court then went on to agree with the city and interveners that the ordinance's inclusionary housing requirements must properly be evaluated under the standard ordinarily applicable to general, legislatively imposed land use regulations, namely whether the ordinance's requirements bear a real and substantial relation to the public welfare. The Court of Appeal determined that the matter should be remanded to the trial court to permit that court to review CBIA's challenge under the proper legal standard.

In the course of its opinion, the Court of Appeal rejected CBIA's reliance upon the *San Remo Hotel*, *supra*, 27 Cal.4th 643, and *City of Patterson*, *supra*, 171 Cal.App.4th 886, decisions. The Court of Appeal concluded that the passage in *San Remo Hotel* relied upon by CBIA was intended to apply only to *development mitigation fees* that are intended to mitigate the deleterious impact of a proposed development, and that the passage does not apply to the affordable housing requirements imposed by the challenged San Jose ordinance because those requirements were not enacted for the purpose of mitigating the adverse impact of new development but rather to enhance the public welfare by promoting the use of

21

available land for the development of housing that would be available to low and moderate income households. The Court of Appeal similarly found the *City of Patterson* decision inapposite, noting that the city in that case did not propose or advocate any test different from the *San Remo Hotel* test, and that the *City of Patterson* court did not analyze the issue by reference to the city's stated general objective in imposing its affordable housing in lieu fee.

After the Court of Appeal decision, CBIA sought review in this court, maintaining that the appellate opinion in this case directly conflicted with the Court of Appeal decision in *City of Patterson*, *supra*, 171 Cal.App.4th 886, and that *City of Patterson* was correctly decided. We granted review to determine the soundness of the appellate court's ruling in this case.

In analyzing this question, we first consider an initial point that divided the lower court decisions in this case — whether the conditions imposed by the San Jose ordinance constitute "exactions" for purposes of the federal and state takings clauses and thus trigger the applicability of the unconstitutional conditions doctrine. (See pt. IV., *post*.) Thereafter, we consider whether the passage in this court's decision in *San Remo Hotel*, upon which CBIA relies, applies to the conditions imposed by the challenged inclusionary housing ordinance. (See pt. V., *post*.)

**IV. Does the San Jose inclusionary housing ordinance, in requiring new residential developments to sell some of the proposed new units at an affordable housing price, impose an "exaction" on developers' property under the takings clauses of the federal and California Constitutions, so as to bring into play the unconstitutional conditions doctrine?**

We begin with the well-established principle that under the California Constitution a municipality has broad authority, under its general police power, to regulate the development and use of real property within its jurisdiction to promote the public welfare. (Cal. Const., art. XI, § 7; *Big Creek Lumber Co. v.*

22

*County of Santa Cruz* (2006) 38 Cal.4th 1139, 1151-1152.)  The variety and range of permissible land use regulations are extensive and familiar, including, for example, restrictions on the types of activities for which such property may be used (commercial or residential, or specific types of commercial ventures or specific types of residential developments — single family, multiunit), limitations on the density and size of permissible residential development (permissible lot size, number of units per lot, minimum or maximum square footage of units, number of bedrooms), required set-backs, aesthetic restrictions and requirements, and price controls (for example, rent control).  As a general matter, so long as a land use restriction or regulation bears a reasonable relationship to the public welfare, the restriction or regulation is constitutionally permissible.  (See, e.g., *Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 604-607 (*City of Livermore*); *Miller v. Board of Public Works* (1925) 195 Cal. 477, 490; *Schad v. Mount Ephraim* (1981) 452 U.S. 61, 68; *Euclid v. Amber Realty Co.* (1926) 272 U.S. 365 (*Euclid*).)

We review challenges to the exercise of such power deferentially.  "In deciding whether a challenged [land use] ordinance reasonably relates to the public welfare, the courts recognize that such ordinances are presumed to be constitutional, and come before the court with every intendment in their favor."  (*City of Livermore*, *supra*, 18 Cal.3d at pp. 604-605.)  Accordingly, a party challenging the facial validity of a legislative land use measure ordinarily bears the burden of demonstrating that the measure lacks a reasonable relationship to the public welfare.  (See, e.g., *Goldblatt v. Hempstead* (1962) 369 U.S. 590, 596; *Building Industry Assn. of Central California v. County of Stanislaus* (2010) 190 Cal.App.4th 582, 591.)   Nonetheless, as this court explained in *City of Livermore*, *supra*, 18 Cal.3d at p. 609, although land use regulations are generally entitled to deference, "judicial deference is not judicial abdication.  The ordinance must have

23

a *real and substantial* relation to the public welfare. [Citation.] There must be a reasonable basis in fact, not in fancy, to support the legislative determination. [Citation.] Although in many cases it will be 'fairly debatable' [citation] that the ordinance reasonably relates to the regional welfare, it cannot be assumed that a land use ordinance can *never* be invalidated as an enactment in excess of the police power." (See also *McKay Jewelers v. Bowron* (1942) 19 Cal.2d 595, 600-601; *Skalko v. City of Sunnyvale* (1939) 14 Cal.2d 213, 215-216.)

In the present case, however, CBIA contends that this traditional standard of judicial review is not applicable and that the conditions that the ordinance imposes upon a proposed new development are valid only if those conditions bear a reasonable relationship to the amount of the city's need for affordable housing that is attributable to the proposed development itself, rather than that the ordinance's conditions bear a reasonable relationship to the public welfare of the city and region as a whole. It also contends that the city, rather than the party challenging the ordinance, bears the burden of proof regarding the validity of the ordinance.

As already noted, although the precise nature and source of CBIA's constitutional claim was somewhat opaque in earlier stages of this litigation, in its briefing in this court CBIA has clarified that its facial constitutional challenge rests upon the takings clauses of the United States and California Constitutions (U.S. Const., 5th and 14th Amends.; Cal. Const., art. I, § 19),[10] and, more

---

[10] The Fifth Amendment of the United States Constitution provides in relevant part: ". . . nor shall private property be taken for public use without just compensation." The United States Supreme Court has long held that the takings clause of the Fifth Amendment is made applicable to the states through the Fourteenth Amendment. (*Chicago, B. & Q. R. Co. v. Chicago* (1897) 166 U.S. 226, 239.)

*(footnote continued on next page)*

24

specifically, on the claim "that the Ordinance violates the unconstitutional conditions doctrine, as applied to development exactions." As we shall explain, however, there can be no valid unconstitutional-conditions takings claim without a government exaction of property, and the ordinance in the present case does not effect an exaction. Rather, the ordinance is an example of a municipality's permissible regulation of the use of land under its broad police power.

As a general matter, the unconstitutional conditions doctrine imposes special restrictions upon the government's otherwise broad authority to condition the grant of a privilege or benefit when a proposed condition requires the individual to give up or refrain from exercising a constitutional right. (See, e.g., *Perry v. Sindermann* (1972) 408 U.S. 593, 597-598; *Pickering v. Board of Education* (1968) 391 U.S. 563, 568.) In the takings context, the special limitations imposed by the unconstitutional conditions doctrine upon which CBIA relies derive from the United States Supreme Court's decisions in *Nollan v.*

---

*(footnote continued from previous page)*

Unlike the federal takings clause, which provides simply that private property shall not be *taken* for public use without just compensation, the California takings clause provides that private property shall not be *taken or damaged* for public use without just compensation. (Cal. Const., art. I, § 19, subd. (a).) The governing California authorities make clear that the reference to "damaged" in this constitutional provision refers to physical damage and does not encompass the simple reduction in the value of real property that may result from a land use restriction or regulation or other governmental action. (See, e.g., *Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 376-378; *HFH Ltd. v. Superior Court* (1975) 15 Cal.3d 508, 517-518; *Allegretti & Co. v. County of Imperial* (2006) 138 Cal.App.4th 1261, 1278-1279.) In contexts comparable to that at issue in this case, past cases of this court have interpreted the state takings clause "congruently" with the federal takings clause. (See, e.g., *San Remo Hotel*, *supra*, 27 Cal.4th at p. 664.)

*California Coastal Commission* (1987) 483 U.S. 825 (*Nollan*) and *Dolan v. City of Tigard* (1994) 512 U.S. 374 (*Dolan*).

In both *Nollan*, *supra*, 483 U.S. 825, and *Dolan*, *supra*, 512 U.S. 374, the high court considered the validity of ad hoc administrative decisions regarding individual land-use permit applications that required a property owner, as a condition of obtaining a sought-after permit, *to dedicate a portion of the property to public use*. In *Nollan*, the California Coastal Commission had conditioned its grant of a permit to allow the property owner to demolish a small beachfront bungalow and construct a three-bedroom residence upon the owner's agreement to grant an easement to the public to enter and cross the owner's beachfront property near the water's edge. In *Dolan*, the city had conditioned its grant of a permit to allow the property owner to substantially increase the size of its existing retail business upon the owner's agreement to give a strip of the property to the city for use as part of a public flood-control greenway and bike path.

In *Nollan*, *supra*, 483 U.S. 825, in explaining why the takings clause justified special scrutiny of the coastal commission's imposition of the challenged permit condition at issue in that case, the high court began its analysis by observing: "Had California simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach, rather than conditioning their permit to rebuild their house on their agreeing to do so, we have no doubt there would have been a taking." (*Id*. at p. 831.) Similarly, in *Dolan*, the high court noted that "had the city simply required petitioner to dedicate a strip of land . . . for public use, rather than conditioning the grant of her permit to redevelop her property on such a dedication, a taking would have occurred." (*Dolan*, *supra*, 512 U.S. at p. 384.) Because under the takings clause a property owner has the right to be paid just compensation when the government takes his or her property for public use, the

26

court in *Nollan* declared that special scrutiny of a governmental action is warranted "*where the actual conveyance of property* is made a condition for the lifting of a land-use restriction, since in that context there is heightened risk that the [government's] purpose is avoidance of the compensation requirement, rather than the stated police-power objective" upon which the condition is ostensibly based. (*Nollan*, at p. 841, italics added.) Thereafter, the *Nollan* and *Dolan* decisions proceeded to explain and describe the nature and extent of the special scrutiny that is called for under the takings clause when the government conditions the grant of a land use permit on the property owner's agreement to dedicate a portion of its property for public use without the payment of just compensation. Under *Nollan* and *Dolan*, the government may impose such a condition only when the government demonstrates that there is an "essential nexus" and "rough proportionality" between the required dedication and the projected impact of the proposed land use. (See *Nollan*, *supra*, at pp. 837-840; *Dolan*, *supra*, at pp. 388-395.)

More recently, in *Koontz v. St. Johns River Water Mgmt. Dist.* (2013) 570 U.S. __ [186 L.Ed.2d 697] (*Koontz*), the high court held that the *Nollan/Dolan* test applies not only when the government conditions approval of a land use permit on the property owner's dedication of a portion of the property for public use but also when it conditions approval of such a permit upon the owner's payment of money. In *Koontz*, the property owner applied for a permit to develop a portion of an undeveloped parcel of land, most of which was classified as wetlands by the state. In his application, the owner agreed to dedicate a portion of the property to the local public water management district as a conservation easement, but the district considered the size of the property owner's proposed conservation easement to be inadequate and instead proposed that the property owner either dedicate a larger portion of the property as a conservation easement or, alternatively, pay for the

27

improvement of other district-owned wetlands within several miles of the owner's property. The property owner refused to accede to the district's proposal, and brought an action in Florida state court against the district, contending among other matters that the district's proposal that he pay a sum of money as an alternative to dedicating an additional portion of his property was itself subject to the *Nollan/Dolan* test and thus that the district was required to show that the amount of money in question satisfied the "essential nexus" and "rough proportionality" requirements set forth in those decisions. The Florida Supreme Court rejected the property owner's contention on the ground that a permit condition that requires a property owner to pay or spend money, as contrasted with a condition that requires the owner to give the public a tangible interest in real property, does not provide a basis for a takings claim, and thus was not subject to the *Nollan/Dolan* test.

In *Koontz, supra*, 570 U.S. at pages __-__ [186 L.Ed.2d at pp. 712-717], a majority of the United States Supreme Court disagreed with the Florida Supreme Court's conclusion on this point. The majority began its analysis of this issue by noting "as an initial matter that if we accepted this argument [that the *Nollan/Dolan* test does not apply to a permit condition that requires the property owner to pay money] it would be very easy for land-use permitting officials to evade the limitations of *Nollan* and *Dolan*. Because the government need only provide a permit applicant with one alternative that satisfies the nexus and rough proportionality standards, a permitting authority wishing to exact an easement could simply give the owner a choice of either surrendering an easement or making a payment equal to the easement's value. . . . For that reason and those that follow, we reject respondent's argument and hold that so-called 'monetary exactions' must satisfy the nexus and rough proportionality requirements of *Nollan* and *Dolan*." (*Id.* at p. __ [186 L.Ed.2d at p. 713].)

28

It is clear from the decision in *Koontz, supra*, 570 U.S. __ [186 L.Ed.2d 697], that the *Nollan/Dolan* standard applies to the type of "so-called 'monetary exactions' " (*Koonz*, at p. __ [186 L.Ed.2d p. 713]) involved in *Koontz* itself — that is, a monetary payment that is a substitute for the property owner's dedication of property to the public and that is intended to mitigate the environmental impact of the proposed project. However, the full range of monetary land-use permit conditions to which the *Nollan/Dolan* test applies under the *Koontz* decision remains at least somewhat ambiguous.[11] Nonetheless, the *Koontz* decision

---

[11]     As the passage quoted in the text illustrates (see *Koontz, supra*, 570 U.S. at p. __ [186 L.Ed.2d at p. 713]), at times the court in *Koontz* appears to have relied upon the special risks imposed by monetary conditions, like the monetary payment at issue in that case, that are offered by a permitting authority *as an alternative to or substitute for the actual dedication of property for public use*. (See *id.* at p. __ [186 L.Ed.2d at p. 713]; see also *id.* at p. __ [186 L.Ed.2d at p. 716] [noting that "respondent has maintained throughout this litigation that it considered petitioner's money to be a substitute for his deeding to the public a conservation easement on a larger parcel of undeveloped land"].) At other points, however, the opinion in *Koontz* speaks more broadly and suggests that the *Nollan/Dolan* test applies to monetary permit conditions even when the monetary payment is not imposed in lieu of a requirement that the property owner dedicate a property interest. (See *Koontz, supra,* at pp. __-__ [186 L.Ed.2d at pp. 713-714] ["the demand for money at issue here did 'operate upon . . . an identified property interest' by directing the owner of a particular piece of property to make a monetary payment. [Citation.] In this case . . . the monetary obligation burdened petitioner's ownership of a specific parcel of land."]; *id.* at p. __ [186 L.Ed.2d at p. 714] ["when the government commands the relinquishment of funds linked to a specific, identifiable property interest such as a bank account or parcel of real property, a '*per se* [takings] approach' is the proper mode of analysis under the Court's precedent."].) For the reasons discussed hereafter, we need not, and do not, resolve this ambiguity in the present case.

     An additional ambiguity arises from the fact that the monetary condition in *Koontz*, like the conditions at issue in *Nollan* and *Dolan*, was imposed by the district on an ad hoc basis upon an individual permit applicant, and was not a legislatively prescribed condition that applied to a broad class of permit applicants. In this respect, the money payment at issue in *Koontz* was similar to the monetary

*(footnote continued on next page)*

explicitly acknowledges that "[a] predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing." (*Koontz, supra,* at p. __ [186 L.Ed.2d at p. 712].)  Or, in other words, the condition is one that would have constituted a taking of property without just compensation if it were imposed by the government on a property owner outside of the permit process.  (*Id.* at p. __ [186 L.Ed.2d at pp. 712-713, 714]; see *Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 547 (*Lingle*) [*Nollan* and *Dolan* both involved "dedications of property so onerous that, outside the exactions context, they would be deemed *per se* physical takings"].)  Nothing in *Koontz* suggests that the unconstitutional conditions doctrine under *Nollan* and *Dolan* would apply where the government simply restricts the use of property without demanding the conveyance of some identifiable protected property interest (a dedication of

---

*(footnote continued from previous page)*

recreational-mitigation fee at issue in this court's decision in *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854 (*Ehrlich*), where we held that because of the greater risk of arbitrariness and abuse that is present when a monetary condition is imposed on an individual permit applicant on an ad hoc basis, the validity of the ad hoc fee imposed in that case should properly be evaluated under the *Nollan*/*Dolan* test.  (*Ehrlich*, *supra*, at pp. 874-885 (plur. opn. of Arabian, J.); *id.* at pp. 899-901 (conc. opn. of Mosk, J.); *id.* at pp. 903, 907 (conc. & dis. opn. of Kennard, J.); *id.* at p. 912 (conc. & dis. opn. of Werdegar, J.).)  The *Koontz* decision does not purport to decide whether the *Nollan/Dolan* test is applicable to legislatively prescribed monetary permit conditions that apply to a broad class of proposed developments.  (See *Koontz, supra*, 570 U.S. at p. __ [186 L.Ed.2d at p. 723] (dis. opn. of Kagan, J.).)  Our court has held that legislatively prescribed monetary fees that are imposed as a condition of development are not subject to the *Nollan/Dolan* test.  (*San Remo Hotel, supra*, 27 Cal.4th at pp. 663-671; see *Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 966-967 (*Santa Monica Beach*).)

30

property or the payment of money) as a condition of approval.  It is the governmental requirement that the property owner convey some identifiable property interest that constitutes a so-called "exaction" under the takings clause and that brings the unconstitutional conditions doctrine into play.  (See *Lingle*, *supra*, at pp. 546-547; *Monterey v. Del Monte Dunes at Monterey, Ltd.* (1999) 526 U.S. 687, 702 ["[W]e have not extended the rough-proportionality test of *Dolan* beyond the special context of exactions — land-use decisions conditioning approval of development on the dedication of property to public use."].)

In the present case, contrary to CBIA's contention, the San Jose inclusionary housing ordinance does not violate the unconstitutional conditions doctrine because there is no exaction — the ordinance does not require a developer to give up a property interest for which the government would have been required to pay just compensation under the takings clause outside of the permit process.  As summarized above, the principal requirement that the challenged ordinance imposes upon a developer is that the developer sell 15 percent of its on-site for-sale units at an affordable housing price.  This condition does not require the developer to dedicate any portion of its property to the public or to pay any money to the public.  Instead, like many other land use regulations, this condition simply places a restriction on the way the developer may use its property by limiting the price for which the developer may offer some of its units for sale.  (See, e.g., *Yee v. Escondido* (1992) 503 U.S. 519, 532 (*Yee*) [describing mobilehome park rent control ordinance as "a regulation of [the mobilehome park owners'] *use* of their property"].)  Contrary to CBIA's contention, such a requirement does not constitute an exaction for purposes of the *Nollan/Dolan* line of decisions and does not trigger application of the unconstitutional conditions doctrine.

31

Rather than being an exaction, the ordinance falls within what we have already described as municipalities' general broad discretion to regulate the use of real property to serve the legitimate interests of the general public and the community at large. For example, municipalities may designate certain areas of a city where only residential units may be built and other areas where only commercial projects are permitted. (See, e.g., *Euclid*, *supra*, 272 U.S. 365; *Lockard v. City of Los Angeles* (1949) 33 Cal.2d 453, 460.) If a municipality finds that it is in the public interest, it may specify where certain types of retail establishments may be operated and other areas where they may not. (See, e.g., *Hernandez v. City of Hanford* (2007) 41 Cal.4th 279, 296-298 & fn. 10.) If a municipality concludes that the city already has a sufficient number of a specific type of business in a particular neighborhood — for example, adult entertainment businesses — it may prohibit other property owners from using their property in that area for such businesses. (See, e.g., *Young v. American Mini Theatres* (1976) 427 U.S. 50; *Renton v. Playtime Theatres, Inc.* (1986) 475 U.S. 41.) Similarly, if a municipality determines that a particular neighborhood or the community in general is in special need of a specific type of residential development or business establishment — such as a multiunit residential project or a retail shopping center — it may adopt land use regulations to serve such a need. (See, e.g., *Ensign Bickford Realty Corp. v. City Council* (1977) 68 Cal.App.3d 467, 477-478.) In addition, of course, a municipality may impose land use limitations on the height of buildings, set-back requirements, density limits (lot size and number of units per lot), bedroom requirements and a variety of other use restrictions. (See, e.g., *Griffin Development Co. v. City of Oxnard* (1985) 39 Cal.3d 256, 265-266.)

As a general matter, so long as a land use regulation does not constitute a physical taking or deprive a property owner of all viable economic use of the property, such a restriction does not violate the takings clause insofar as it governs

32

a property owner's future use of his or her property,[12] except in the unusual circumstance in which the use restriction is properly found to go "too far" and to constitute a "regulatory taking" under the ad hoc, multifactored test discussed by the United States Supreme Court in *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104 (*Penn Central*). (See *Lingle*, *supra*, 544 U.S. at pp. 538-539.)[13] Where a restriction on the use of property would not constitute a taking of property without just compensation if imposed outside of the permit process, a permit condition imposing such a use restriction does not require a permit applicant to give up the constitutional right to just compensation in order to obtain the permit and thus does not constitute "an exaction" so as to bring into play the unconstitutional conditions doctrine. (See, e.g., *Powell v. County of Humboldt* (2014) 222 Cal.App.4th 1424, 1435-1441.)

As noted, the legislative history of the ordinance in question establishes that the City of San Jose found there was a significant and increasing need for affordable housing in the city to meet the city's regional share of housing needs under the California Housing Element Law and that the public interest would best be served if new affordable housing were integrated into economically diverse

---

[12] Special considerations and principles come into play with regard to a municipality's application of such limitations to existing uses that do not conform to the municipality's newly imposed restrictions — that is, to preexisting nonconforming uses. (See generally 8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, §§ 1040-1045, pp. 636-645.) The ordinance at issue applies only to residential units that are to be constructed or rehabilitated in the future.

[13] The factors identified in *Penn Central* include the "economic impact of the regulation on the claimant," "the extent to which the regulation has interfered with distinct investment-backed expectations," and "the character of the governmental action." (*Penn Central*, *supra*, 438 U.S. at p. 124.)

development projects, and that it enacted the challenged ordinance in order to further these objectives. The objectives of increasing the amount of affordable housing in the city to comply with the Housing Element Law and of locating such housing in economically diverse developments are unquestionably constitutionally permissible purposes. (See, e.g., *Santa Monica Beach, supra*, 19 Cal.4th at p. 970; *Home Builders Assn. v. City of Napa* (2009) 90 Cal.App.4th 188, 195 (*City of Napa*).) CBIA does not argue otherwise.

There are a variety of conditions or restrictions that a municipality could impose on new residential development in an effort to increase the community's stock of affordable housing and promote economically diverse residential developments. For example, a municipality might attempt to achieve these objectives by requiring all new residential developments to include a specified percentage of studio, one-bedroom, or small-square-footage units, on the theory that smaller units are more likely to be affordable to low or moderate income households than larger units. Although such use restrictions might well reduce the value of undeveloped property or lessen the profits a developer could obtain in the absence of such requirements, CBIA cites no authority, and we are aware of none, suggesting that such use restrictions would constitute a taking of property outside the permit process or that a permit condition that imposes such use restrictions on a proposed development would constitute an exaction under the takings clause that would be subject to the *Nollan/Dolan* test.

Here, the challenged ordinance seeks to increase the city's stock of affordable housing and promote economically diverse residential projects by placing controls on the sales price of a portion of a developer's on-site for-sale units rather than by placing restrictions on the size or other features of a portion of the for-sale units. But the fact that the ordinance imposes price controls rather than other use restrictions in order to accomplish its legitimate purposes does not

34

render such price controls an exaction or support application of a constitutionally based judicial standard of review that is more demanding than that applied to other land use regulations. The governing federal and state authorities plainly establish that price controls, like other forms of regulation, are, as a general matter, a constitutionally permissible means to achieve a municipality's legitimate public purposes. (See, e.g., *Nebbia v. New York* (1934) 291 U.S. 502, 539 ["Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty"]; *Permian Basin Area Rate Cases* (1968) 390 U.S. 747, 768 ["It is plain that the Constitution does not forbid the imposition, in appropriate circumstances, of maximum prices upon commercial and other activities. *A legislative power to create price ceilings has, in 'countries where the common law prevails,' been 'customary from time immemorial'* " (italics added)]; accord, *Pennell v. San Jose* (1988) 485 U.S. 1, 11-14 (*Pennell*); *Yee*, *supra*, 503 U.S. at pp. 528-530; *Santa Monica Beach*, *supra*, 19 Cal.4th at p. 967; *Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 771-777 (*Kavanau*); *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 816 (*Calfarm*); *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 165 (*Birkenfeld*).)

Furthermore, as we explained in *Santa Monica Beach*, *supra*, 19 Cal.4th 952, the United States Supreme Court has held that one of the constitutionally permissible purposes that justifies the imposition of limits on the rent a landlord may charge his or her tenants is "that of ' "prevent[ing] excessive and unreasonable rent increases" caused by the "growing shortage of and increasing demand for housing" ' within a municipality." (*Id.* at p. 969, quoting *Pennell, supra*, 485 U.S. at p. 12.) There is no reason that a municipality's comparable interest in combatting the excessive sale prices of housing that are caused by the

35

growing shortage of and increasing demand for housing, and that deny moderate and lower income families the opportunity to reside within the city, does not similarly justify the city's imposition of price controls on a portion of the units that are offered for sale in a proposed new residential development. (Accord, *Pennell*, *supra*, at pp. 12-13 [recognizing that "a legitimate and rational goal of price or rate regulation is the protection of consumer welfare" and upholding a rent control ordinance that permitted " 'hardship to a tenant' " to be considered in determining the reasonableness of a landlord's proposed rent increase].)

A municipality's authority to impose price controls on developers is, of course, unquestionably subject to constitutional limits. In this court's decision in *Kavanau*, *supra*, 16 Cal.4th at pages 771-777, we discussed the constitutional restrictions placed on price controls by the due process and takings clauses, and explained that such controls would be unconstitutional if they are found to be confiscatory, that is, if they deny a property owner a fair and reasonable return on its property. (See *Birkenfeld, supra*, 17 Cal.3d at p. 165; *Calfarm*, *supra*, 48 Cal.3d at pp. 816-817.) In this case, however, the ordinance has not yet been applied to any proposed development, and there is no indication that application of price controls on 15 percent of a development's on-sale units, along with the availability of economically advantageous density bonuses, exemptions from on-site parking requirements, and financial subsidies, would produce a confiscatory result. (See *Penn Central, supra*, 438 U.S. at pp. 130-131 [" 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole."].) Indeed, in this facial

36

challenge to the ordinance, CBIA does not claim that the requirements imposed by the ordinance will have a confiscatory effect.

Further, although we explained in *Kavanau* that past decisions have generally applied a "confiscatory" analysis to challenges to price controls that are premised on either the takings clause or the due process clause — "focusing on the regulation's impact and investors' ability to earn a fair return" (*Kavanau*, *supra*, 16 Cal.4th at p. 776, citing *Duquesne Light Co. v. Barasch* (1989) 488 U.S. 299, 305; *FCC v. Florida Power Corp.* (1987) 480 U.S. 245, 250-254) — we also observed in *Kavanau* that several high court cases indicate that other takings analyses also apply to price controls (*Kavanau*, *supra*, at p. 777, citing *Yee*, *supra*, 503 U.S. at p. 529; *Pennell*, *supra*, 485 U.S. at pp. 8-14.)  These latter cases indicate that price controls may be impermissible if found to constitute a "regulatory taking" under the ad hoc, multifactored test set forth in *Penn Central*, *supra*, 438 U.S. 104.  (See, e.g., *Yee*, *supra*, 503 U.S. at p. 529-531.)  Here, however, CBIA has expressly disclaimed any reliance on the *Penn Central* doctrine.

As we have explained, an ordinance that places nonconfiscatory price controls on the sale of residential units and does not amount to a regulatory taking would not constitute a taking of property without just compensation even if the price controls were applied to a property owner who had not sought a land use permit.  Accordingly, the inclusionary housing ordinance's imposition of such price controls as a condition of a development permit does not constitute the imposition of an exaction for purposes of the unconstitutional conditions doctrine under the takings clause.

In maintaining its contrary view that the San Jose inclusionary housing requirement constitutes an exaction that compels a developer to convey a property interest to the city as a condition of development, CBIA relies primarily upon the

discussion of exactions in this court's recent decision in *Sterling Park, L.P. v. City of Palo Alto* (2013) 57 Cal.4th 1193, 1207 (*Sterling Park*), a case which also involved an affordable housing ordinance.  In part VI., *post*, we describe the specific legal issue that was presented in *Sterling Park* and this court's holding in that case, and explain why CBIA's reliance on the *Sterling Park* decision itself is not well founded.  At this juncture, we explain why, whether or not the San Jose inclusionary housing requirement at issue here is properly viewed as an exaction for purposes of the *procedural* statute that was at issue in *Sterling Park*, the San Jose inclusionary housing requirement does not require a developer to convey or dedicate to the city a property interest as a condition of development and therefore is not an exaction for purposes of the unconstitutional conditions doctrine as applied in the takings context.

CBIA first contends that the ordinance should be viewed as requiring the owner to convey property to the city as a condition of development because, by requiring the developer to sell at a below market (affordable) price a portion of the units that it could otherwise sell at market value, the ordinance "divests the owner of the difference, in money, between the market value of the property and the affordable price of the property."  To begin with, however, because the San Jose ordinance makes available a number of economically beneficial incentives — including a density bonus, a reduction in parking requirements, and potential financial subsidies — to developers who choose to comply with the affordable housing requirements by providing on-site affordable housing units, it is not the case that the San Jose ordinance will necessarily reduce a developer's revenue or profit from what the developer could earn by selling all of the units at market rate, or will do so either in the "great majority of cases" (see *San Remo Hotel*, *supra*, 27 Cal.4th at p. 673), frequently, or, indeed, in any instance.  In this facial challenge

38

to the ordinance, CBIA has not and cannot show that the ordinance will have such an effect.[14]

In any event, it is well established that the fact that a land use regulation may diminish the market value that the property would command in the absence of the regulation — i.e., that the regulation reduces the money that the property owner can obtain upon sale of the property — does not constitute a taking of the diminished value of the property. Most land use regulations or restrictions reduce the value of property; in this regard the affordable housing requirement at issue here is no different from limitations on density, unit size, number of bedrooms, required set-backs, or building heights. (See, e.g., *Griffin Development Co. v. City of Oxnard*, *supra*, 39 Cal.3d at p. 267 ["most land use regulations have 'the inevitable effect of reducing the value of regulated properties' "].) Although the magnitude of a regulation's economic impact upon a property owner is one factor that is relevant in determining whether there is a regulatory taking under the *Penn Central* test (see *Penn Central*, *supra*, 438 U.S. at p. 124), as already noted CBIA explicitly does not contend that the ordinance constitutes a regulatory taking under *Penn Central.* Past cases establish that the potential reduction in a developer's profit does not in itself amount to a taking or a required dedication of property or render the ordinance's price controls an exaction of property, as CBIA asserts. (*Penn Central*, *supra*, at pp. 124-126; *Penna. Coal Co. v. Mahon* (1922) 260 U.S. 393, 413 ["Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the

---

**14** Because the ordinance will not necessarily lead to a reduction in the profit a developer would obtain in the absence of the ordinance, CBIA cannot properly assert that the ordinance, on its face, requires a developer to "subsidize" those households who purchase affordable units.

general law"]; *Permian Basin Area Rate Cases*, *supra*, 390 U.S. at p. 769 ["No constitutional objection arises from the imposition of maximum prices merely because . . . the value of regulated property is reduced as a consequence of regulation"]; *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 685-686.)

CBIA additionally maintains that the challenged ordinance does constitute an exaction because it assertedly requires a developer to convey a property interest to the city by virtue of the section of the ordinance that is intended to ensure that the units that are initially made available as affordable housing units will continue to be affordable in the future, or at least that the city will retain the same number of affordable units upon resale. (S.J.M.C. § 5.08.600.) Contrary to CBIA's assertion, however, this provision of the ordinance does not require a developer to convey a property interest to the city. This feature of the ordinance operates in the future on a person who has purchased an affordable unit, rather than on the developer, placing a restriction on the affordable unit owner's use of his or her property. Because this feature of the ordinance places no additional requirement or burden on the developer, it clearly does not take, or impose an exaction upon, *the developer's property*. Unlike the Palo Alto inclusionary housing ordinance at issue in *Sterling Park*, *supra*, 57 Cal.4th at page 1207, which CBIA analogizes to the challenged ordinance, the San Jose ordinance does not require that the developer grant the city an option to purchase each affordable unit when the unit is up for sale or resale.[15]

---

[15] Although an option to purchase is one type of document that may be included to ensure the continued affordability of an affordable unit under the San Jose ordinance, the applicable section of the ordinance does not require the developer to grant an option to purchase to the city either on the initial sale or resale of an affordable housing unit, and the section lists a large number of alternative documents and mechanisms that may be used to preserve the number of affordable housing units. (See S.J.M.C. § 5.08.600 A., quoted *ante*, pp. 17-18.)

*(footnote continued on next page)*

Moreover, CBIA does not contend that the section of the ordinance in question constitutes a taking *of an affordable unit owner's property* that requires just compensation, and no such claim could plausibly be made. Under the provision in question, an individual who is permitted to purchase an affordable housing unit at a below market, affordable housing price will do so on the explicit condition and clear understanding that if and when he or she sells the unit, he or she is required to sell the unit at an affordable housing price, and that if, instead, the unit is sold at market rate, under the "shared appreciation document[]" that must be agreed upon by the purchaser, "the difference between the market rate value of the inclusionary unit and the affordable housing cost, plus a share of appreciation realized from an unrestricted sale in such amounts as deemed necessary by the city to replace the inclusionary unit" must be placed into an affordable housing fund that is to be used exclusively to provide housing to lower and moderate income households. (S.J.M.C. §§ 5.08.600 A., 5.08.700.)[16] Just as the ordinance's restriction on the developer's use of its property does not constitute a compensable taking or exaction (see, *ante*, pp. 32-37), an individual who has purchased an affordable housing unit under the use restriction imposed by this section of the ordinance cannot tenably claim that such property has been taken without just compensation when he or she is subsequently required, upon

---

*(footnote continued from previous page)*

Accordingly, in this facial challenge, the San Jose ordinance cannot properly be equated with the ordinance at issue in *Sterling Park*.

[16]    Thus, like the long-term rental unit in-lieu fee that was upheld by this court in *San Remo Hotel*, *supra*, 27 Cal.4th 643, the captured amount will be utilized to replace the affordable housing unit that would be lost if such a unit is resold at market rate, directly offsetting the adverse impact that such resale would have on the number of existing affordable housing units in the city.

41

resale of the unit, to comply with the use restriction — a restriction that obviously is reasonably related to preserving the affordable housing policy from which the affordable housing unit owner has directly benefited.

In addition, contrary to CBIA's contention, the fact that the ordinance requires restrictions upon resale to be recorded against the residential development and all inclusionary units does not transform these requirements into property interests possessed by the city. Recordation simply assures that would-be purchasers of the affordable units are on notice regarding the restrictions relating to resale and is no different from the routine recording of other types of land use restrictions that are intended to continue for a specified period of time.

In sum, for all of the foregoing reasons, the basic requirement imposed by the challenged ordinance — conditioning the grant of a development permit for new developments of more than 20 units upon a developer's agreement to offer for sale at an affordable housing price at least 15 percent of the on-site for-sale units — does not constitute an exaction for purposes of the takings clause so as to bring into play the unconstitutional conditions doctrine under the *Nollan*, *Dolan*, and *Koontz* decisions.

Finally, the *Koontz* decision further makes clear that so long as a permitting authority offers a property owner at least one alternative means of satisfying a condition that does not violate the takings clause, the property owner has not been subjected to an unconstitutional condition. (*Koontz*, *supra*, 570 U.S. at p. __ [186 L.Ed.2d at pp. 712, 713].) Accordingly, because the requirement that a developer offer at least 15 percent of a development's for-sale units at an affordable housing price does not violate the *Nollan/Dolan* doctrine, it follows that the affordable housing requirement of the San Jose ordinance as a whole — including the voluntary off-site options and in lieu fee that the ordinance makes available to a

42

developer — does not impose an unconstitutional condition in violation of the takings clause.

**V.  Does the passage in *San Remo Hotel*, *supra*, 27 Cal.4th 643, 671, relied on by CBIA, apply to the affordable housing condition imposed by San Jose's inclusionary housing ordinance?**

CBIA also rests its facial challenge to the validity of the San Jose ordinance upon a passage in this court's decision in *San Remo Hotel*, *supra*, 27 Cal.4th at page 671.  CBIA characterizes this portion of the *San Remo Hotel* decision as resting upon an application of the unconstitutional conditions doctrine, but we have demonstrated that doctrine is not applicable here because the ordinance does not effect an exaction.  We note, however, that the passage in question in *San Remo Hotel* did not itself refer to that doctrine and the Court of Appeal decision in *City of Patterson*, *supra*, 171 Cal.App.4th 886, upon which CBIA also relies, did not analyze the passage in *San Remo Hotel* as an aspect of the unconstitutional conditions doctrine.  Accordingly, notwithstanding our rejection of CBIA's unconstitutional conditions claim, we shall consider whether the passage in *San Remo Hotel* upon which CBIA relies should properly be interpreted as applicable to the challenged inclusionary housing ordinance.

CBIA proffers its argument in the face of the holding of the Court of Appeal in *City of Napa, supra,* 90 Cal.App.4th 188, a case involving a facial constitutional challenge to an inclusionary housing ordinance very similar to the San Jose ordinance at issue here.  There, the Court of Appeal held that the ordinance was properly evaluated pursuant to the ordinary standard of review generally applicable to land use regulations. Applying that standard, the *City of*

43

*Napa* court held that the challenged inclusionary housing ordinance was constitutionally valid. (90 Cal.App.4th at pp. 195-197.)[17]

CBIA contends, however, that this court's decision in *San Remo Hotel*, *supra*, 27 Cal.4th 643, which was decided after *City of Napa*, *supra*, 90 Cal.App.4th 188, should be interpreted to limit inclusionary housing requirements only to those that are reasonably related to the adverse impacts that are caused by or attributable to the proposed developments that are subject to the ordinance — in effect, to requirements that satisfy something similar to the *Nollan/Dolan* test.

In *San Remo Hotel*, *supra*, 27 Cal.4th 643, the land use restriction at issue was a legislatively adopted ordinance aimed at preserving the amount of existing long-term rental housing units in the city. The ordinance required any property owner who proposed to convert existing long-term rental units to short-term tourist units either to provide a comparable number of long-term rental units at another location or to pay an in lieu fee into a fund dedicated exclusively to the acquisition or construction of long-term rental units in the city. Evaluating the

---

[17] At the time of the *City of Napa* decision, the controlling United States Supreme Court decision provided that a land use regulation "effects a taking if the ordinance does not substantially advance legitimate state interests . . . ." (*Agins v. Tiburon* (1980) 447 U.S. 255, 260.) The *City of Napa* decision applied that standard in upholding the inclusionary housing ordinance. Three years later, in *Lingle*, *supra*, 544 U.S. 528, the federal high court held that the "substantially advance" standard set out in *Agins* is not an appropriate standard for determining when a taking of property has occurred, and instead that the categorical and regulatory taking categories described in *Penn Central*, *supra*, 438 U.S. 104, constitute the appropriate taking standards. (*Lingle*, *supra*, 544 U.S. at pp. 540-545.) After *Lingle*, the California Court of Appeal, in *Action Apartment Assn. v. City of Santa Monica* (2008) 166 Cal.App.4th 456, 467-471, upheld the validity of an inclusionary housing ordinance against a facial constitutional challenge, rejecting the plaintiffs' claim that under *Lingle* the ordinance was subject to the *Nollan/Dolan* standard of review.

44

validity of the in lieu fee that had been imposed on the property owner in that case, this court held in *San Remo Hotel* that the challenged fee was valid because it was reasonably related to mitigating the impact that the landowner's proposed conversion would have on the preservation of long-term rental housing in the city. (*San Remo Hotel, supra,* 27 Cal.4th at pp. 672-679.)

CBIA relies on one passage in the *San Remo Hotel* opinion that it asserts indicates the conditions or requirements imposed by San Jose's inclusionary housing ordinance are valid solely if they bear a reasonable relationship to the deleterious public impacts attributable to the developments that are subject to the ordinance. As we explain, properly interpreted, the passage in *San Remo Hotel* does not support CBIA's contention.

The passage in question in *San Remo Hotel* is contained in a paragraph responding to and rejecting an argument, based upon a hypothetical ordinance, that had been advanced by the plaintiffs in that case. In asserting that the legislatively prescribed long-term rental replacement fee before the court in *San Remo Hotel* should be evaluated under the *Nollan/Dolan* heightened scrutiny standard, the plaintiffs in *San Remo Hotel* warned of "the danger a local legislative body will use such purported mitigation fees — unrelated to the impacts of development — simply to fill its coffers" and hypothesized that "absent careful constitutional scrutiny a city could 'put zoning up for sale' by, for example, 'prohibit[ing] all development except for one-story single-family homes, but offer[ing] a second story permit for $20,000, an apartment building permit for $10,000 per unit, a commercial building permit for $50,000 per floor, and so forth.' " (*San Remo Hotel*, *supra*, 27 Cal.4th at p. 670.)

In response to the plaintiffs' argument, the opinion in *San Remo Hotel* first declined "to extend heightened takings scrutiny to all development fees" and instead adhered to the distinction drawn in earlier decisions of this court "between

45

ad hoc exactions and legislatively mandated, formulaic mitigation fees." (*San Remo Hotel*, *supra*, 27 Cal.4th at pp. 670-671, citing *Ehrlich*, *supra*, 12 Cal.4th 854, *Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006, and *Santa Monica Beach*, *supra*, 19 Cal.4th 952.)  The opinion explained:  "While legislatively mandated fees do present some danger of improper leveraging, such generally applicable legislation is subject to the ordinary restraints of the democratic political process.  A city council that charged extortionate fees for all property development, unjustified by mitigation needs, would likely face widespread and well-financed opposition at the next election.  Ad hoc individual monetary exactions deserve special scrutiny mainly because, affecting fewer citizens and evading systematic assessment, they are more likely to escape such political controls."  (*San Remo Hotel, supra*, at p. 671.)

The following paragraph in *San Remo Hotel* then set forth the court's response to the plaintiffs' hypothetical:  "Nor are plaintiffs correct that, without *Nollan/Dolan/Ehrlich* scrutiny, legislatively imposed development mitigation fees are subject to no meaningful means-ends review.  *As a matter of both statutory and constitutional law, such fees must bear a reasonable relationship, in both intended use and amount, to the deleterious public impact of the development.* (Gov. Code, § 66001; *Ehrlich*, *supra*, 12 Cal.4th at pp. 865, 867 (plur. opn. of Arabian, J.); *id.* at p. 897 (conc. opn. of Mosk, J.); *Associated Home Builders etc., Inc. v. City of Walnut Creek* (1971) 4 Cal.3d 633, 640.)  Plaintiffs' hypothetical city could only 'put [its] zoning up for sale' in the manner imagined if the 'prices' charged, and the intended use of the proceeds, bore a reasonable relationship to the impacts of the various development intensity levels on public resources and interests.  While the relationship between means and ends need not be so close or so thoroughly established for legislatively imposed fees as for ad hoc fees subject to *Ehrlich*, the arbitrary and extortionate use of purported mitigation fees, even

46

where legislatively mandated, will not pass constitutional muster." (*San Remo Hotel, supra,* 27 Cal.4th at p. 671, italics added.)

CBIA contends that the italicized sentence just quoted should be interpreted to mean that the conditions imposed by the San Jose ordinance — requiring developments of 20 or more units to make 15 percent of their on-site for-sale units available for sale at affordable housing prices — would be valid only if those requirements "bear a reasonable relationship, in both intended use and amount, to the deleterious public impact of the development." (*San Remo Hotel*, *supra*, 27 Cal.4th at p. 671.)  For several reasons, we conclude that CBIA's contention lacks merit.

First, there is no indication that the passage in *San Remo Hotel* was intended to apply to permit conditions, like the price controls imposed by the challenged inclusionary housing ordinance, that regulate or place limits upon the use of a property owner's property, rather than solely to conditions that require an applicant to pay a monetary fee as a condition of obtaining a permit.  The language of the passage itself speaks specifically of "fees," not to conditions limiting the use of property, and, as noted, the passage in *San Remo Hotel* was a direct response to the concern expressed by the plaintiffs in that case that a permitting authority would "use such purported mitigation fees — unrelated to the impacts of development — simply to fill its coffers." (*San Remo Hotel*, *supra*, 27 Cal.4th at p. 670.)  In light of "the special vulnerability of land use permit applicants to extortionate demands for money" (*Koontz*, *supra*, 570 U.S. at p. __ [186 L.Ed.2d at p. 717]), the passage is reasonably understood as applying to permit conditions that require the payment of monetary fees.

Second, as we explain, a close reading of the entire paragraph containing the italicized sentence discloses that the paragraph is explicitly addressed and applies only to "development *mitigation* fees" (*San Remo Hotel*, *supra*, 27 Cal.4th

47

at p. 671, italics added) — that is, to fees whose purpose is to mitigate the effects or impacts of the developments on which the fee is imposed — and does not purport to apply to price controls or other land use restrictions that serve a broader constitutionally permissible purpose or purposes unrelated to the impact of the proposed development.

To begin, the initial sentence of the paragraph is explicitly limited to "legislatively imposed development *mitigation* fees . . . ." (*San Remo Hotel*, *supra*, 27 Cal.4th at p. 671, italics added.)  Next, the term "fee" as used in the statute cited after the second sentence of the passage — Government Code section 66001, a key provision of California's Mitigation Fee Act — is statutorily defined to mean "*a monetary exaction . . . that is charged* by a local agency to the applicant in connection with approval of a development project *for the purpose of defraying all or a portion of the cost of public facilities related to the development project . . . .*" (Gov. Code, § 66000, subd. (b), italics added.)  The term "fee" does not purport to encompass use restrictions, and certainly not use restrictions that are imposed for a different purpose.  Further, the portions of the plurality and concurring opinion in *Ehrlich*, *supra*, 12 Cal.4th at pages 865, 867, 895, and of the majority opinion in *Associated Home Builders*, *supra*, 4 Cal.3d at page 640, to which this paragraph in *San Remo Hotel* refers, similarly all involved development mitigation fees whose purpose was to mitigate the effects of the proposed developments, not use restrictions that were designed to serve other purposes. Finally, the concluding sentence of the paragraph again refers explicitly to "purported *mitigation* fees" (italics added), not to other types of permit conditions.

Viewed in isolation, the third sentence of the paragraph — referring to the plaintiffs' suggestion that a hypothetical city might put up its zoning for sale — could conceivably be read broadly to refer to *any* type of development fee. However, when viewed in the context of the paragraph as a whole, and

48

particularly having in mind the paragraph's focus on a "meaningful means-end review" (*San Remo Hotel*, *supra*, 27 Cal.4th at p. 671), it appears clear that the entire paragraph applies only to development mitigation fees ― and not to price controls or other land use conditions or requirements (i.e., "means") that are imposed on proposed developments for a constitutionally permissible purpose (i.e., "end") other than mitigating the impact of the proposed development. Nothing in *San Remo Hotel* purported to repudiate existing authority such as the decision in *City of Napa*, *supra*, 90 Cal.App.4th 188, applying ordinary judicial standards of review to land use regulations of the type involved in the present case.[18]

In *San Remo Hotel*, *supra*, 27 Cal.4th 643, the long-term rental unit replacement requirement (and the related in-lieu fee) that was at issue was explicitly intended to mitigate the adverse effect that a proposed conversion of long-term rental units into tourist units would have on the city's stock of long-term rental units. (*Id.* at p. 650.) Thus, the court's means-end analysis in that case was understandably and properly focused upon whether the fee was reasonably related to mitigating the impact of the proposed conversion. In the present case, as well, one of the purposes of the challenged ordinance is to alleviate the impacts that

[18]    In stating that "[a]s a matter of both statutory and constitutional law, [legislatively imposed development mitigation] fees must bear a reasonable relationship, in both intended use and amount, to the deleterious public impact of the development" (*San Remo Hotel*, *supra*, 27 Cal.4th at p. 671), the opinion in *San Remo Hotel* did not indicate whether the "constitutional law" to which the passage refers was a reference to due process or takings principles. Because the ordinance in this case does not impose a development mitigation fee, we have no occasion to explore that jurisprudential question, or to discuss how the constraints imposed on legislatively prescribed development mitigation fees by the federal or state Constitution compare with the constraints imposed by the Mitigation Fee Act.

49

proposed market-rate residential development would have on the city's affordable housing needs.[19]

Here, however, the ordinance makes clear that its purpose goes beyond mitigating the impacts attributable to the proposed developments that are subject to the ordinance. The San Jose ordinance is additionally aimed at a number of distinct but nonetheless important and constitutionally permissible public purposes, namely (1) to increase the amount of affordable housing in San Jose so that the municipality can meet its responsibility of providing an adequate supply of housing for individuals and families at all income levels and, at the same time, (2) to assure that new affordable housing is distributed throughout the city in economically diverse developments, avoiding the problems and detrimental effects that municipalities have experienced in the past when low income housing is relegated to separate, isolated locations within the community. Like other zoning or land use regulations that are intended to shape and enhance the character and quality of life of the community as a whole, San Jose's inclusionary housing ordinance is intended to advance purposes beyond mitigating the impacts or effects that are attributable to a particular development or project and instead "to

---

[19]     As noted above (*ante*, p. 13), the ordinance identifies two distinct adverse impacts that new market rate residential developments have upon the city's existing affordable housing problem. First, new market rate housing developments without affordable units use a portion of the limited existing land in the city that is available for affordable housing and drive up the price of the remaining land, reducing the opportunities for the construction of affordable housing. Second, new residents of market rate housing create a demand for new employees to service the needs of the new residents, and many of the needed new employees (for example, teachers, transportation workers, etc.) will earn incomes that are not adequate for market rate housing in the city. As a result, new market rate housing exacerbates the city's affordable housing problem.

50

produce a widespread public benefit" (*Penn Central*, *supra*, 438 U.S. at p. 134, fn. 30) that inures generally to the municipality as a whole, providing such benefits to residents of new market-rate housing as well as to the other residents of the community.

When a municipality enacts a broad zoning law that designates different areas of the community for single-family housing, multiunit residences, and commercial ventures, the validity of the law does not depend upon a judicial means-end determination that focuses exclusively on the restrictions' relationship to the adverse impact that would result from an alternative use of a particular parcel or a particular proposed project. (See, e.g., *Lingle*, *supra*, 544 U.S. at pp. 544-545; *Penn Central*, *supra,* 438 U.S. at pp. 133-135; *HFH, Ltd. v. Superior Court*, *supra*, 15 Cal.3d at pp. 520-521.) Similarly, when a municipality enacts a broad inclusionary housing ordinance to increase the amount of affordable housing in the community and to disperse new affordable housing in economically diverse projects throughout the community, the validity of the ordinance does not depend upon a showing that the restrictions are reasonably related to the impact of a particular development to which the ordinance applies. Rather, the restrictions must be reasonably related to the broad general welfare purposes for which the ordinance was enacted.

Unlike the decision in *San Remo Hotel*, in which we addressed a development fee that was intended solely to mitigate the adverse effect of the proposed conversion of long-term rental units to tourist units, in this court's earlier decision in *Ehrlich*, *supra*, 12 Cal.4th 854, we had occasion to consider, among other issues, the validity of a land use permit condition or requirement that was intended, like the affordable housing condition at issue here, to serve a constitutionally permissible public purpose other than mitigating the impact of the proposed development project. For this reason, the *Ehrlich* decision provides

51

useful guidance in ascertaining the standard under which the validity of the San Jose inclusionary housing ordinance is properly evaluated.

In *Ehrlich*, *supra*, 12 Cal.4th 854, the developer challenged the validity of two different types of development conditions that the defendant city had imposed as a condition of the plaintiff's proposed development:  (1) a recreational-facility replacement fee and (2) a public art requirement.  The court in *Ehrlich* first held that the ad hoc recreational-facility replacement fee that had been imposed in that case should properly be evaluated under the *Nollan/Dolan* standard (*Ehrlich, supra,* at pp. 874-881 (plur. opn. of Arabian, J.); *id.* at pp. 899-901 (conc. opn. of Mosk, J.)), and, as such, the amount of the fee was required to be roughly proportional to the adverse public impact attributable to the loss of property reserved for private recreational use that would result from the developer's proposed project.  (*Id*. at pp. 882-885 (plur. opn. of Arabian, J.); *id.* at pp. 901-902 (conc. opn. of Mosk, J.).)  Applying the *Nollan/Dolan* standard, the court in *Ehrlich* concluded that the record was insufficient to support the amount of the recreational-facility replacement fee that had been imposed in that case.  (*Id.* at pp. 884-885 (plur. opn. of Arabian, J.); *id.* at pp. 901-902 (conc. opn. of Mosk, J.).)

By contrast, with respect to the public art condition — which required the developer either (1) to pay into the city art fund a fee equal to 1 percent of the total building valuation, or (2) to contribute an approved work of public art of an equivalent value that could be placed on site or donated to the city for placement elsewhere — the court in *Ehrlich* did not evaluate the validity of the condition by asking whether or not the amount of the required fee or value of the work of art was reasonably related to the adverse impact that the proposed development would have on the existing state of public art in the city.  The purpose of the public art requirement in question was not to replace existing public art that would be

52

eliminated by a proposed project or to mitigate any adverse impact on the amount of public art in the community that would result from the proposed development. Instead, the purpose of the public art requirement was to increase the works of public art that are present in the community for the general benefit of the community as a whole, by requiring all future large development projects to provide some public art or to pay an in lieu fee to be used for the acquisition of public art in another location. Given this purpose, application of a legal test that would limit all public art requirements only to those requirements that mitigate the impact of a proposed project would have resulted in the invalidation of the challenged condition. Instead, in *Ehrlich* this court upheld the validity of the public art requirement (including the related in lieu public art fee) upon finding that the requirement (and related in lieu fee) was reasonably related to the constitutionally legitimate public purpose of increasing the amount of publicly accessible works of art for the benefit of the community and the public as a whole. (*Ehrlich, supra,* 12 Cal.4th at pp. 885-886 (plur. opn. of Arabian, J.); *id.* at p. 902 (conc. opn. of Mosk, J.); *id.* at p. 907 (conc. & dis. opn. of Kennard, J.); *id.* at p. 912 (conc. & dis. opn. of Werdegar, J.).)

CBIA argues that this court's decision upholding the validity of the public art condition in *Ehrlich*, *supra*, 12 Cal.4th 854, is not applicable to the affordable housing requirement at issue here because, unlike the public art requirement, the affordable housing requirement challenged in this case is not an "aesthetic control." CBIA, however, fails to identify a persuasive constitutional or other legal justification for limiting our holding in *Ehrlich* to development restrictions that constitute "aesthetic controls." CBIA maintains that the requirement in *Ehrlich* that a developer provide public art or pay an in lieu fee was more like ordinary land use restrictions commonly contained in zoning or building codes than the price controls imposed by San Jose's inclusionary housing ordinance.

53

Whether or not that is true, as already explained, it is well established that price controls are a constitutionally permissible form of regulation with regard to real property as well as to other types of property or services. (See, *ante*, pp. 35-36.) Accordingly, just as it would be permissible for a municipality to attempt to increase the amount of affordable housing in the community and to promote economically diverse developments by requiring all new residential developments to include a specified percentage of studio, one-bedroom, or small-square-footage units, there is no reason why a municipality may not alternatively attempt to achieve those same objectives by requiring new developments to set aside a percentage of its proposed units for sale at a price that is affordable to moderate or low income households. So long as the price controls are not confiscatory and do not constitute a regulatory taking, there is no reason such price controls should not be evaluated under the same standard applicable to the public art requirement in *Ehrlich* and other land use measures that are not subject to the *Nollan/Dolan* test, namely, that such regulations must be reasonably related to a constitutionally permissible public purpose.

Finally, the fact that the San Jose ordinance provides a developer with the option of paying an in lieu fee instead of providing the required on-site affordable housing units does not provide a basis for applying the test advocated by CBIA to the ordinance's affordable housing requirements as a whole. No developer is required to pay the in lieu fee and may always opt to satisfy the ordinance by providing on-site affordable housing units. Because an in lieu fee option is often included in inclusionary housing ordinances to satisfy the demands of developers who seek the flexibility that an in lieu fee alternative affords, CBIA cannot properly rely upon the inclusion of such an option as a basis for challenging the validity of the San Jose inclusionary housing ordinance as a whole. (Accord, *Koontz*, *supra*, 570 U.S. at p. __ [186 L.Ed.2d at p. 712] ["We agree with

54

respondent that, so long as a permitting authority offers the landowner at least one alternative that would satisfy *Nollan* and *Dolan,* the landowner has not been subjected to an unconstitutional condition."].)

Moreover, as we have explained above, the validity of the ordinance's requirement that at least 15 percent of a development's for-sale units be affordable to moderate or low income households does not depend on an assessment of the impact that the development itself will have on the municipality's affordable housing situation. Consequently, the validity of the in lieu fee — which is an alternative to the on-site affordable housing requirement — logically cannot depend on whether the amount of the in lieu fee is reasonably related to the development's impact on the city's affordable housing need.

In sum, we conclude that the requirements of the inclusionary housing ordinance at issue here do not conflict with the passage in *San Remo Hotel* upon which CBIA relies. Accordingly, there is no merit to CBIA's contention that, under *San Remo Hotel*, the ordinance is invalid on its face because the city failed to show that the ordinance's inclusionary housing requirements are reasonably related to the impact on affordable housing attributable to such developments.[20]

---

**20** In *Holmdel Builders Assn. v. Township of Holmdel* (N.J. 1990) 583 A.2d 277, the New Jersey Supreme Court reached a similar conclusion in upholding the validity of municipal ordinances that imposed an affordable-housing fee on new development that was to be used to satisfy the municipality's obligation to provide its "fair share" of low and moderate income housing as set forth in earlier New Jersey Supreme Court decisions. (See *Southern Burlington County NAACP v. Mount Laurel Township* (N.J. 1975) 336 A.2d 713 *Southern Burlington County NAACP v. Mount Laurel Township* (N.J. 1983) 456 A.2d 390.)

Rejecting the claim that the affordable-housing fees imposed by such an ordinance require "a but-for causal connection or direct consequential relationship between the private activity that gives rise to the exaction and the public activity to which it is applied" (*Holmdel Builders Assn., supra,* 583 A.2d at p. 288), the court held that "[i]nclusionary zoning through the imposition of development fees is

*(footnote continued on next page)*

We acknowledge that in *City of Patterson*, *supra*, 171 Cal.App.4th 886, a panel of the Court of Appeal reached a contrary conclusion regarding the applicability of the passage in *San Remo Hotel* to an inclusionary housing ordinance. But, as we explain, for a number of reasons we conclude that the *City of Patterson* decision was incorrect in this respect.

In *City of Patterson*, *supra*, 171 Cal.App.4th 886, the applicable ordinance gave a developer the option of building affordable housing units or paying an in lieu fee (*id.* at p. 890), but the appellate court decision in that case focused solely on the question of the validity of the in lieu fee viewed in isolation. (See *id.* at pp. 894-899.) At the time the development in question was first approved by the city, the in lieu affordable-housing fee required by the applicable ordinance was set at $734 per affordable housing unit. Three years later, however, when the developer applied for the required building permit, the applicable in lieu fee had increased (as a result of a very substantial reduction in the federal and state affordable housing subsidies available to the city) to $20,946 per affordable unit. The development agreement that had been entered into by the developer explicitly specified that the applicable in lieu fee would be the fee in effect at the time the building permit was issued, and further noted that the city was then in the process of preparing an updated affordable-housing fee. In the development agreement, the developer agreed to be bound by the revised fee schedule " 'provid[ed] the same is reasonably justified.' " (*Id.* at p. 895.) In bringing the *City of Patterson*

---

*(footnote continued from previous page)*

permissible because such fees are conducive to the creation of a realistic opportunity for the development of affordable housing; development fees are the functional equivalent of mandatory set-asides; and it is fair and reasonable to impose such fee requirements on private developers when they possess, enjoy, and consume land, which constitutes the primary resource for housing." (*Ibid.*)

56

lawsuit, the developer contended that the increased in lieu fee was not "reasonably justified" within the meaning of the agreement.

In addressing the proper interpretation of the term "reasonably justified" as used in the development agreement, the Court of Appeal in *City of Patterson*, *supra*, 171 Cal.App.4th 886, initially concluded that the term should be interpreted to mean "that any increase in the affordable housing in lieu fee would conform to existing law" (*id.* at p. 896), or, in other words, that the revised in lieu fee imposed by the city would be permissible so long as the amount of the revised fee would not violate the established legal principles governing a city's in lieu affordable-housing fee. (*Ibid.*)

Thereafter, in analyzing that issue, the *City of Patterson* court concluded that the requirements set forth in the passage in *San Remo Hotel*, *supra*, 27 Cal.4th 643, discussed above, constituted the applicable legal test governing the validity of the in lieu housing fee at issue in that case. In reaching this conclusion, the *City of Patterson* court reasoned: "Upon examination, it appears that the affordable housing in-lieu fee challenged here is not substantively different from the replacement in-lieu fee considered in *San Remo*. Both are formulaic, legislatively mandated fees imposed as conditions to developing property, not discretionary ad hoc exactions. [Citation.] We conclude, for this reason, that the level of constitutional scrutiny applied by the court in *San Remo* must be applied to City's affordable housing in-lieu fee and is one of the legal requirements incorporated into the Development Agreement." (*City of Patterson*, *supra*, 171 Cal.App.4th at p. 898.) The *City of Patterson* court noted that the city "argues for no different test." (*Ibid.*) Applying the *San Remo Hotel* test, the *City of Patterson* court found that because nothing in the record "demonstrates or implies the increased fee was reasonably related to the need for affordable housing associated with the project"

57

(*City of Patterson*, at p. 899), the increased fee was not reasonably justified within the meaning of the development agreement.

Although the affordable-housing in lieu fee at issue in *City of Patterson*, *supra*, 171 Cal.App.4th 886, and the long-term rental replacement fee at issue in *San Remo Hotel*, *supra*, 27 Cal.4th 643, shared the characteristics noted by the Court of Appeal in *City of Patterson* (both were formulaic, legislatively mandated fees), the court in *City of Patterson* overlooked a critical difference between the two. Unlike the long-term rental replacement in lieu fee in *San Remo Hotel*, the affordable-housing in lieu fee in *City of Patterson* was not imposed for the purpose of mitigating an adverse effect that was caused by the developer but was imposed to further the very different public purpose of increasing the stock of affordable housing in the city to meet the need for affordable housing as determined by the relevant county council of governments. (171 Cal.App.4th at p. 892.) In *City of Patterson*, the defendant city apparently did not raise this point or object to the application of the *San Remo Hotel* test, and the *City of Patterson* court did not take into account this difference from the *San Remo Hotel* case on its own. Moreover, the *City of Patterson* decision did not evaluate the ordinance's affordable housing condition as a whole, and, in particular, failed to consider how the fact that the ordinance afforded the developer the option of complying with the condition by providing affordable housing units within the development affected the validity of the alternative methods of complying with the ordinance's affordable housing condition, including the optional in lieu fee.

For the reasons discussed above, we disapprove the decision in *Building Industry Assn. of Central California v. City of Patterson*, *supra,* 171 Cal.App.4th 886, to the extent it indicates that the conditions imposed by an inclusionary zoning ordinance are valid only if they are reasonably related to the need for affordable housing attributable to the projects to which the ordinance applies. At

58

the same time, because the question is not before us, we express no opinion regarding the validity of the amount of the particular in lieu fee at issue in *City of Patterson* or of the methodology utilized in arriving at that fee. (See *id.* at pp. 891-893.)

**VI. Is this court's recent decision in *Sterling Park*, *supra*, 57 Cal.4th 1193, inconsistent with the conclusions reached above?**

Finally, CBIA asserts that this court's recent decision in *Sterling Park*, *supra*, 57 Cal.4th 1193, supports its contention that the test set forth in *San Remo Hotel*, *supra*, 27 Cal.4th 643, applies to the affordable housing requirement of the San Jose inclusionary housing ordinance at issue here. As we explain, the legal issue that was presented and decided in *Sterling Park* bears no relationship to the issue presented here, and we conclude the *Sterling Park* decision does not support CBIA's position in this case.

In *Sterling Park*, *supra*, 57 Cal.4th 1193, the issue before this court was which of two statutes of limitation applied to the lawsuit at issue in that case. One of the potentially applicable statutes of limitation — Government Code section 66499.37, a part of the Subdivision Map Act — was a general statute of limitations requiring lawsuits challenging the validity of conditions attached to the approval of a tentative or final map to be filed "within 90 days after the date of the decision" attaching the condition. The other potentially applicable statute of limitations — Government Code section 66020, a part of the Mitigation Fee Act — permitted a developer to protest "the imposition of any fees, dedications, reservations, or other exactions" by "[t]endering any required payment in full" under protest and thereafter to file a lawsuit within 180 days after receiving notice of the required payment.

The underlying facts in *Sterling Park*, *supra*, 57 Cal.4th 1193, arose out of an inclusionary housing ordinance adopted by the City of Palo Alto that required

59

housing projects involving the development of five or more acres to provide at least 20 percent of all units as affordable units or alternatively to pay an in lieu fee equal to 10 percent of the actual sales price or fair market price of the market rate units.  The plaintiff developer, who wished to construct 96 residential condominiums on 6.5 acres of land in the city, entered into a development agreement with the city in which the developer agreed to provide 10 below market rate units and to pay an in lieu fee equal to 5.3488 percent of the actual selling price or fair market value of the market rate units.  More than a year after the development agreement had been entered into and the developer's application for a final subdivision map had been approved, at a time when construction of the new units was nearing completion, the city demanded compliance with the below market rate conditions set forth in the development agreement.  At that juncture, the developer, claiming that the prior agreement had been signed under duress and that the below market rate requirements imposed by the ordinance were invalid, submitted "a notice of protest" with the city.  When the city failed to respond to the protest, the developer filed the lawsuit at issue in *Sterling Park*, seeking a declaration that the below-market rate requirements were invalid and praying for equitable relief.

In the trial court proceedings in *Sterling Park*, the city moved for summary judgment on the ground that the developer's lawsuit was untimely, contending that the applicable limitations period was that set out in Government Code section 66499.37, and that under that provision the lawsuit had been filed too late.  The trial court agreed with the city and granted summary judgment in the city's favor; on appeal, the Court of Appeal affirmed, holding that the provisions of Government Code section 66020, relied upon by the developer, were not applicable and that the action was untimely under section 66499.37.  We granted review to determine which statute of limitations — section 66020 or section

60

66499.37 — governed the lawsuit in question. (*Sterling Park, supra,* 57 Cal.4th at p. 1197.)

In *Sterling Park* we concluded that the statute of limitations provisions of Government Code section 66020 (part of the Mitigation Fee Act) should properly be interpreted to apply to the affordable housing requirements imposed by the Palo Alto inclusionary housing ordinance. In reaching that conclusion, we relied heavily on the background and legislative purpose of the protest and statute of limitations provisions of section 66020. We noted that section 66020 was enacted to permit a developer who wished to challenge a fee that was a condition of development to pay the contested fee under protest and to continue with the construction of the development while its legal challenge to the fee went forward. This statutory procedure embodied in section 66020 replaced the prior procedural rule that required a developer either (1) to delay any construction until its legal challenge to a development condition or fee was finally resolved or (2) to go forward with the construction and be treated as having waived any challenge to the contested requirement. (*Sterling Park*, *supra*, 57 Cal.4th at p. 1200.)

In finding the provisions of Government Code section 66020 applicable to the affordable housing requirement at issue in that case, we explained: "The procedure established in section 66020, which permits a developer to pay or otherwise ensure performance of the exactions, and then challenge the exactions while proceeding with the project, makes sense regarding monetary exactions. By the nature of things, some conditions a local entity might impose on a developer, like a limit on the number of units [citation], cannot be challenged while the project is being built. Obviously, one cannot build a project now and litigate later how many units the project can contain — or how large each unit can be, or the validity of other use restrictions a local entity might impose. But the validity of monetary exactions, or requirements that the developer later set aside a certain

61

number of units to be sold below market value, can be litigated while the project is being built. In the former situation — where the nature of the project must be decided before construction — it makes sense to have tight time limits to minimize the delay. In the latter situation — where the project can be built while litigating the validity of fees or other exactions — it makes sense to allow payment under protest followed by a challenge and somewhat less stringent time limits." (*Sterling Park*, *supra*, 57 Cal.4th at pp. 1206-1207.)

In the course of the *Sterling Park* opinion, we rejected the city's contention that the requirements of its inclusionary housing ordinance should not be considered "exactions" as that term is used in Government Code section 66020. We stated in this regard: "The below market rate program is different from a land use regulation of the type at issue in *Fogarty* [*v. City of Chico* (2007) 148 Cal.App.4th 537] (a limit on the number of units that can be built); instead, it is similar to a fee, dedication, or reservation under section 66020. The program offers developers two options, either of which, by itself, would constitute an exaction. The imposition of the in-lieu fees is certainly similar to a fee. Moreover, the requirement that the developer sell units below market rate, including the City's reservation of an option to purchase the below market rate units, is similar to a fee, dedication, or reservation. It may be, as the City argues, that under traditional property law, an option to purchase creates no estate in the land. But a purchase option is a sufficiently strong interest in the property to require compensation if the government takes it in eminent domain. [Citation.] Compelling the developer to give the City a purchase option is an exaction under section 66020. Because of this conclusion, we need not decide whether forcing the developer to sell some units below market value, by itself, would constitute an exaction under section 66020." (*Sterling Park, supra,* 57 Cal.4th at p. 1207.)

As the quoted passage indicates, our decision in *Sterling Park*, *supra*, 57 Cal.4th 1193, left open the question whether the protest procedure and statute of limitations set forth in Government Code section 66020 would apply to the affordable housing requirements of *all* inclusionary housing ordinances, including inclusionary housing ordinances, like the San Jose ordinance at issue here, that do not require the developer to give the city an option to purchase the affordable housing units the developer is obligated to provide. (See, *ante*, p. 40, & fn. 15.) But whether or not the affordable housing requirements of the San Jose ordinance should be considered "exactions" as that term is used in Government Code section 66020, and thus are subject to the procedural protest and statute of limitations provisions of that statute — an issue we need not and do not decide — it is clear that our decision in *Sterling Park* did not address or intend to express any view whatsoever with regard to the legal test that applies in evaluating the substantive validity of the affordable housing requirements imposed by an inclusionary housing ordinance. The opinion in *Sterling Park* focused exclusively on the procedural issue presented in that case and made no mention of the passage in *San Remo Hotel*, *supra*, 27 Cal.4th 643, or any other substantive legal test. Nothing in *Sterling Park* supports CBIA's claim that the challenged San Jose ordinance is subject to a judicial standard of review different from that traditionally applied to other legislatively mandated land use development requirements.

### VII.  Conclusion

As noted at the outset of this opinion, for many decades California statutes and judicial decisions have recognized the critical need for more affordable housing in this state.  Over the years, a variety of means have been advanced and undertaken to address this challenging need.  We emphasize that the legal question before our court in this case is not the wisdom or efficacy of the particular tool or method that the City of San Jose has adopted, but simply whether, as the Court of Appeal held, the San Jose ordinance is subject to the ordinary standard of judicial review to which legislative land use regulations have traditionally been subjected.

For the reasons discussed above, the judgment of the Court of Appeal is affirmed.

**CANTIL-SAKAUYE, C. J.**


**WE CONCUR:**

**WERDEGAR, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

**CONCURRING OPINION BY WERDEGAR, J.**

I concur fully in the majority opinion, which I have signed. I write separately to speak to the current status and meaning of the "reasonable relationship" constitutional standard set out in *San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643 (*San Remo Hotel*), a decision I authored for the court.

As explained in the majority opinion (maj. opn., *ante*, at pp. 45–47), in *San Remo Hotel* we addressed the constitutional standard for reviewing legislatively prescribed, formulaic mitigation fees. We first determined such fees were not subject to the heightened means-ends scrutiny established under the takings clause in *Nollan v. California Coastal Commission* (1987) 483 U.S. 825 (*Nollan*) and *Dolan v. City of Tigard* (1994) 512 U.S. 374 (*Dolan*) for ad hoc, discretionary exactions. (*San Remo Hotel, supra*, 27 Cal.4th at pp. 665–671.) In reaching this conclusion, we rejected the plaintiffs' contention that a lack of heightened scrutiny would mean legislatively imposed development mitigation fees would not be subject to meaningful means-ends review, stating: "As a matter of both statutory and constitutional law, such fees must bear a reasonable relationship, in both intended use and amount, to the deleterious public impact of the development. . . . While the relationship between means and ends need not be so close or so thoroughly established for legislatively imposed fees as for ad hoc fees subject to *Ehrlich*, the arbitrary and extortionate use of purported mitigation fees, even where legislatively mandated, will not pass constitutional muster." (*San Remo*

*Hotel, supra,* 27 Cal.4th at p. 671, citing *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854 (*Ehrlich*) [applying *Nollan and Dolan* to ad hoc fees].)  Applying the constitutional standard, we then concluded the challenged housing replacement fee bore a reasonable relationship to the loss of housing caused by conversion of hotel rooms from residential to tourist use.  (*San Remo Hotel*, at p. 673.)

As the majority opinion observes, the court in *San Remo Hotel* did not specify whether the constitutional provision from which it drew the reasonable relationship test for legislatively formulated development mitigation fees was the due process clause, the takings clause, or both.  (Maj. opn., *ante*, at p. 49, fn. 18.) Because the ordinance at issue in this case does not impose a mitigation fee, the court today has no occasion to address the constitutional derivation or exact dimensions of this reasonable relationship standard.  (*Ibid.*)  For future cases, however, it may be helpful to note a significant change in federal constitutional law since *San Remo Hotel*'s decision, a change that suggests the reasonable relationship test for mitigation fees may be no more demanding than the deferential standard applicable to ordinary land use regulations under the due process clause.  (See maj. opn., *ante*, at pp. 23–24 [land use regulation meets due process limitations if it bears a reasonable relationship to the public welfare].)

At the time we decided *San Remo Hotel*, the United States Supreme Court's takings doctrine held a land use regulation "effects a taking if the ordinance does not substantially advance legitimate state interests . . . ."  (*Agins v. Tiburon* (1980) 447 U.S. 255, 260 (*Agins*).)  *After* our decision, the high court in *Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 540–545 (*Lingle*) clarified that this means-ends standard stated a due process principle, not a test for a regulatory taking.  But in the meantime, the *Agins* standard appears to have played a leading role in *San Remo Hotel*'s statement of a reasonable relationship standard for legislatively formulated development mitigation fees.

In *San Remo Hotel*, we outlined the broad categories of recognized takings claims, listing last the "substantially advance" standard; we then introduced the

2

plaintiffs' claims as implicating "the last-mentioned prong of the high court's takings analysis." (*San Remo Hotel*, *supra*, 27 Cal.4th at p. 665.) And as decisional authority for the reasonable relationship test we applied to those claims, we cited portions of the plurality opinion and of Justice Mosk's concurrence in *Ehrlich*, both of which directly or indirectly invoked the *Agins* "substantially advance" takings test. (*San Remo Hotel*, *supra*, 27 Cal.4th at p. 671; see *Ehrlich*, *supra*, 12 Cal.4th at pp. 865–867, 870, fn. 7 (plur. opn.) [equating reasonable relationship takings standard with *Nollan/Dolan* scrutiny and viewing latter as derived from " 'substantially advance' " test], 897 (conc. opn. of Mosk, J.) [viewing reasonable relationship takings standard as closer to rational basis test than to *Nollan/Dolan* scrutiny, but deriving it from *Agins*'s means-ends takings principle].)

San Remo Hotel*'s use of a means-ends analysis to evaluate the plaintiffs' takings claims was appropriate in light of the then-extant "substantially advance" prong of federal takings law. But three years later, in *Lingle*, the high court "correct[ed] course" (*Lingle*, *supra*, 544 U.S. at p. 548) and eliminated means-ends analysis as a distinct prong of takings law. The court determined that *Agins*'s formula "prescribes an inquiry in the nature of a due process, not a takings, test, and that it has no proper place in our takings jurisprudence." (*Lingle*, at p. 540.) The court explained that *Agins* had drawn its standard from due process cases, not takings ones, and that means-ends testing of this nature belonged solely to due process analysis: "The 'substantially advances' formula suggests a means-ends test: It asks, in essence, whether a regulation of private property is *effective* in achieving some legitimate public purpose. An inquiry of this nature has some logic in the context of a due process challenge, for a regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause. . . . But such a test is not a valid method of discerning whether private property has been 'taken' for purposes of the Fifth Amendment." (*Lingle*, at p. 542.) The *Lingle* court

3

further explained that *Nollan* and *Dolan*, though they both quoted the *Agins* formula, actually rested on the very different principle of " ' "unconstitutional conditions." ' " (*Lingle*, at pp. 547-548; see maj. opn., *ante*, at pp. 25–27.)

Given the high court's abandonment of the idea that a regulation works a taking of private property if it does not substantially advance a legitimate government interest, how should our statement in *San Remo Hotel*—that legislatively formulated mitigation fees must, as a constitutional as well as a statutory matter, be reasonably related to the development's impacts—be understood? Does *San Remo Hotel* state a takings test or a due process test?

Theoretically, one could argue *Lingle* makes no difference, as it addressed federal constitutional law while the plaintiffs in *San Remo Hotel* brought their challenge solely under the California Constitution. (*San Remo Hotel*, *supra*, 27 Cal.4th at p. 664.) But we observed in *San Remo Hotel* that the two Constitutions' takings clauses are, with some exceptions, generally construed congruently, and we therefore analyzed the plaintiffs' takings claim "under the relevant decisions of both this court and the United States Supreme Court." (*San Remo Hotel*, at p. 664.) Had *Lingle* already been decided, we would have considered it in our analysis.

In light of *Lingle*, I believe, *San Remo Hotel*'s reasonable relationship test for legislatively formulated mitigation fees is best understood to state a due process standard, not a takings one. As the *Lingle* court emphasized, regulatory takings law is centrally concerned not with the "fit" between a regulation and its goals but with the burdens the regulation imposes on a property owner, both absolutely and relative to others in the community. "The owner of a property subject to a regulation that *effectively* serves a legitimate state interest may be just as singled out and just as burdened as the owner of a property subject to an *ineffective* regulation. . . . Likewise, an ineffective regulation may not significantly burden property rights at all, and it may distribute any burden broadly and evenly among property owners." (*Lingle*, *supra*, 544 U.S. at p. 543.) *San*

4

*Remo Hotel*'s reasonable relationship test does not focus on the absolute or relative burden of a mitigation fee, but on whether it is reasonably justified by the legislative goal of mitigating development impacts. As such, it relates most naturally not to whether private property has been taken but to whether the fee regulation is "so arbitrary or irrational that it runs afoul of the Due Process Clause." (*Lingle*, at p. 542.)

As explained in the majority opinion, in a due process challenge to police power regulations, the burden of proof is on the party challenging the ordinance, rather than on the government: the challenger must demonstrate that the measure lacks a reasonable relationship to the public welfare. (Maj. opn., *ante*, at p. 23.) A developer challenging a legislatively mandated mitigation fee under *San Remo Hotel* would thus need to show the fee lacks a substantial relationship to the deleterious impacts of, or public resource needs created by, the development. This mode of means-ends scrutiny has been generally equated to the rational-basis standard. (See *Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 978–980 (conc. opn. of Kennard, J.).) Under this deferential form of analysis, for the challenger to show that the city or other entity imposing a fee had not undertaken individualized studies to determine the size of fee needed for mitigating the impacts of each development presumably would not be enough. I am unaware of any decisions suggesting a mitigation fee is arbitrary or irrational merely because it is not demonstrably proportionate to individual development impacts, so long as the fee schedule's overall scale and structure has a real and substantial relationship to the public measures needed to accommodate and mitigate the effects of the development. (See *San Remo Hotel*, *supra*, 27 Cal.4th at p. 672 [reasonable relationship standard does not "open to searching judicial scrutiny the wisdom of myriad government economic regulations"].)

Again, I concur without qualification in the majority opinion, which appropriately refrains from addressing in detail issues that are not before us here. I add the above discussion only as a potentially useful reference point for analysis in any future case where the constitutionality of a legislatively mandated development mitigation fee is at issue.

**WERDEGAR, J.**

**CONCURRING OPINION BY CHIN, J.**


I agree that the inclusionary housing ordinance at issue here is not an exaction of property for takings purposes and thus is not subject to the test this court established in *San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643. Instead, "the ordinance falls within . . . municipalities' general broad discretion to regulate the use of real property to serve the legitimate interests of the general public and the community at large." (Maj. opn., *ante*, at p. 32.) But my reasons for upholding the ordinance are narrow.

The ordinance requires the developer to provide a certain number of units that are more affordable, i.e., less expensive, than the unrestricted units presumably will be. This requirement might cause the developer to make a smaller profit on these affordable units than on other units, but so do many valid zoning requirements. What the ordinance does *not* do, at least on a facial challenge, is require the developer to provide *subsidized* housing.

The ordinance does not prohibit the developer from building the affordable units in a less expensive way than the other units. It does restrict the ways the developer can build the affordable units more cheaply than other units. As the majority summarizes it, the ordinance requires that the affordable units "have the same quality of exterior design and comparable square footage and bedroom count as market rate units." (Maj. opn., *ante*, at p. 17.) But the ordinance also "permits

1

some different 'unit types' of affordable units (for example, in developments with detached single-family market rate units, the affordable units may be attached single-family units or may be placed on smaller lots than the market rate units) [citation], and also allows the affordable units to have different, but functionally equivalent, interior finishes, features, and amenities, compared with the market rate units." (Ibid.)

Thus, the ordinance leaves room for the developer to build the affordable units more cheaply than the other units. Accordingly, it is not clear to me, and certainly not on a facial challenge, that the developer could not turn a profit even on the affordable units, although probably a smaller one than on the unrestricted units. Because of this, I agree with the majority that the ordinance is a valid land use regulation.

But an ordinance that did require the developer to provide subsidized housing, for example, by requiring it to sell some units below cost, would present an entirely different situation. Such an ordinance would appear to be an exaction, and I question whether it could be upheld as simply a form of price control. (See, e.g., maj. opn., *ante*, at pp 36-37.)

Providing affordable housing is a strong, perhaps even compelling, governmental interest. But it is an interest of the *government*. Or, as the majority puts it, it is an interest "of the general public and the community at large." (Maj. opn., *ante*, at p. 32.) The community as a whole should bear the burden of furthering this interest, not merely some segment of the community. "All of us must bear our fair share of the public costs of maintaining and improving the communities in which we live and work. But the United States Constitution, through the takings clause of the Fifth Amendment, protects us all from being arbitrarily singled out and subjected to bearing a disproportionate share of these

2

costs." (*Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 912 (conc. & dis. opn. of Kennard, J.).)

With this caveat, I join the majority in upholding the ordinance in question.

**CHIN, J.**

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** California Building Industry Association v City of San Jose
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 216 Cal.App.4th 1373
**Rehearing Granted**

_____

**Opinion No.** S212072
**Date Filed:** June 15, 2015
_____

**Court:** Superior
**County:** Santa Clara
**Judge:** Socrates Peter Manoukian

_____

**Counsel:**

Berliner Cohen, Andrew L. Faber, Thomas P. Murphy; Richard Doyle, City Attorney, Nora Frimann, Assistant City Attorney and Margo Laskowska, Deputy City Attorney, for Defendant and Appellant.

Burke, Williams & Sorensen and Thomas P. Brown for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Appellant.

Kamala D. Harris, Attorney General, Edward C. DuMont, State Solicitor General, John A. Saurenman, Assistant Attorney General, Janill L. Richards, Deptuy State Solicitor General, Daniel L. Siegel and Christiana Tiedemann, Deputy Attorneys General, for Attorney General, as Amicus Curiae on behalf of Defendant and Appellant.

Richard A. Rothschild, KeAndra Dodds and Navneet K. Grewal for National Housing Law Project, Public Advocates, Public Counsel and Western Center on Law and Poverty as Amici Curiae on behalf of Defendant and Appellant.

Michael Timothy Iglesias for Leo T. McCarthy Center for Public Service and the Common Good, Corey Cook, Elizabeth S. Anderson, Peter Marcuse, Dr. Patrick Sharkey, Susan Eaton, Carolina K. Reid, Dr. Mark Santow, Camille Z. Charles, Elizabeth J. Mueller, James A. Kushner, Rigel C. Oliveri, William P. Quigley, David Rusk, Janis M. Breidenbach, Peter Dreier, J. Rosie Tighe, Victoria Basolo, Stephen Menendian, John A. Powell, Tracy K'Meyer, Philip Tegeler, James J. Kelly, Jr., Gregory D. Squires, Peter W. Salsich, Jr., Florence Wagman Roisman, Nico Calavita, Gerald S. Dickinson, Thomas M. Shapiro, Dan Immergluck, Myron Orfield, Jr., Timothy M. Mulvaney, George Lipsitz, Sarah Schindler, Michael P. Seng, John Goering, Joe Feagin, Nancy Denton, Kathleen C. Engel, John Mollenkopf, Gary Dymski, Gary Orfield, Mark L. Roark, Todd Swanstrom, William M. Wiecek and Susan D. Bennett as Amici Curiae on behalf of Defendant and Appellant.

Fenwick & West, Ryan J. Marton, Sebastian E. Kaplan and Julia M. Kolibachuk for Silicon Valley Leadership Group and Working Partnership USA as Amici Curiae on behalf of Defendant and Appellant.

**Page 2 – S212072 – counsel continued**

**Counsel:**

Law Foundation of Silicon Valley Public Interest Law Firm, Kyra Kazantzis, James F. Zahradka II, Melissa A. Morris; The Public Interest Law Project California Affordable Housing Law Project, Michael Rawson; Wilson Sonsini Goodrich & Rosati, Colleen Bal, Corina I. Cacovean; and L. David Nefouse for Interveners and Appellants.

Sheppard, Mullin, Richter & Hampton, Rutan & Tucker, David P. Lanferman, James G. Higgins; Pacific Legal Foundation, Damien M. Schiff, Anthony L. Francois; Nick Cammarota; and Paul Campos for Plaintiff and Respondent.

Paul B. Campos for Building Industry Association of the Bay Area as Amicus Curiae on behalf of Plaintiff and Respondent.

June Babiracki Barlow and Neil Kain for California Association of REALTORS as Amicus Curiae on behalf of Plaintiff and Respondent.

Devala A. Janardan and Thomas J. Ward for National Association of Home Builders of as Amicus Curiae on behalf of Plaintiff and Respondent.

2

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Andrew L. Faber
Berliner Cohen
Ten Almaden Boulevard, 11th Floor
San Jose, CA  95113-2233
(408) 286-5800

Melissa A. Morris
Law Foundation of Silicon Valley Public Interest Law Firm
152 N. Third Street, 3rd Floor
San Jose, CA  95112
(408) 280-2401

Anthony L. Francois
Pacific Legal Foundation
930 G Street
Sacramento, CA  95814
(916) 419-7111